1  ALAN P. CAPLAN
   630 Carolina Street
2  San Francisco, CA 94107
   (415) 826-2371
3  (415) 824-7148 (Fax)
   MA Bar No: 072700
4  Email: apc716@pacbell.net

5
   Attorney for Defendant
6  RUSSELL LYLES, JR.

7

8              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF CALIFORNIA
9

10 UNITED STATES OF AMERICA,          )
                                      )    No: CR–08-00420-PJH-1
11              Plaintiff,            )        3-08-70351 MAG
                                      )
12 vs.                                )
                                      )
13                                    )    **DECLARATION OF ATTORNEY**
   RUSSEL LYLES, JR.                  )    **ALAN CAPLAN IN SUPPORT OF**
14                                    )    **DEFENDANT LYLES' MOTION TO**
                                      )    **RECONSIDER DETENTION ORDER**
15              Defendant.            )
   _____)

16

17     I, Alan P. Caplan, hereby state under the pains and penalties of perjury, as follows:

18

19 1.  I have been a member of the bar of this Court for 26 years, and I am counsel for

20     defendant Russell Lyles, Jr. in the above-entitled matter.  I filed my appearance for Mr.

21     Lyles on July 16, 2008.

22

23 2.  On June 17, 2008, one month before I filed my appearance for Mr. Lyles, this Court

24     ordered him to be detained pretrial, after a detention hearing at which he was represented

25     by previous counsel.

26

27

28

3. I appeared before Magistrate Judge James on July 16, 2008 for a status hearing re counsel. At that time, AUSA Leung delivered discovery materials to me that had not been available to previous counsel at the time of the Detention Hearing on June 17.

4. Included among those discovery materials were 3 CDs. Two of the disks contained still photographs and video footage taken by law enforcement personnel during the search of Mr. Lyles' home on June 12, 2008. Most of the photographs and almost all of the video footage are so dark as to be unviewable.

5. The third disk delivered to me on July 16, 2008 contained a 33 minute audio recording of questions from law enforcement agents to Mr. Lyles and his responses while the search of his residence was being conducted at approximately 0530 hours on June 12, 2008. Those questions and answers are the basis for what the government proffered, and the Court accepted as "defendant's confession", as memorialized in the Court's Detention Order, ¶ 3. I have since listened to this CD on several occasions, and I have taken careful and detailed notes as to its contents. I have also reviewed it with Mr. Lyles.

6. AUSA Leung also provided me with a detailed copy of Mr. Lyle's criminal history, which I have since reviewed with Mr. Lyles and with other counsel.

7. On July 16th I also requested that Mr. Leung provide me with a copy of the search warrant application, affidavit and return of service, which he agreed to do after obtaining an "unsealing order" from the Court. Copies of these documents were faxed to me on July 24, 2008, and I have also subsequently reviewed them with Mr. Lyles.

8. I have carefully reviewed the Court's Detention Order, and believe that the factual bases for many of the Court's factual determinations and conclusions were substantially predicated upon inaccurate, and, in some instances, incomplete information provided to it by the government and the Pretrial Services Officer.

9. I also believe that there is highly relevant information in regard to Mr. Lyles' release that was not presented or provided to the Court because previous counsel did not have the benefit of the recently provided discovery in responding to the government's motion for pretrial detention.

10. In addition, there is other pertinent information that was not presented to the Court, which is related to what the Court referred to in its detention order as "defendant's affinity for violence and weapons".   [Detention Order, P. 5, ¶ 7].   Such information was not reasonably or readily available to previous counsel at the time of the detention hearing.

11. I believe that the Court would have released Mr. Lyles on conditions if it had been provided with accurate and complete information from government sources, and if it also had the opportunity to consider the additional facts and information provided herein and in defendant's accompanying Memorandum of Points and Authorities.

12. In the remainder of this declaration, I will address many of the factual conclusions and concerns pertaining to Mr. Lyles that were raised and discussed by the Court in its detention order.  In each instance, I will note the Court's factual finding or conclusion, and then address the basis for my assertion that it was based upon inaccurate and/or incomplete information.

1

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

13. In the accompanying Memorandum of Points and Authorities, which has been filed contemporaneously herewith, I will address certain other factual matters that are outside of the scope of my direct personal knowledge, and will also argue the legal implications of such matters to Mr. Lyles' motion to revoke the detention and admit him to pretrial release.

14. In its detention order, the Court relied extensively upon information pertaining to Mr. Lyles' membership in the Hells Angels Motorcycle Club ("HAMC") that was provided to it by the government directly and also indirectly through submissions to the Pretrial Services Officer. Based upon my experience and knowledge developed over more than three decades of representing HAMC members throughout the United States, I am aware that much of that information was either false or inaccurate.

15. I have represented members of the HAMC for approximately 35 years, including criminal cases in the United States District Courts for the Districts of Massachusetts, Northern District of New York, Northern District of Ohio, District of Nebraska, Northern District of California, District of Connecticut, District of New Hampshire, District of Minnesota, District of Nevada, Eastern District of New York, Southern District of New York, and District of Vermont; in the United States Courts of Appeals for the First, Second, Sixth, Eighth and Ninth Circuits; and in the State Courts of California, Connecticut, Maine, Massachusetts, Nebraska, New Jersey, New Hampshire, Ohio, and Rhode Island.

16. Many of these HAMC-related cases in which I was counsel involved allegations of serious crimes including murder, racketeering, manufacturing and distribution of

controlled substances and possession of firearms. During the course of such representation I became aware of many inaccuracies and falsehoods in regard to the HAMC that were repeatedly advanced by the prosecution and law enforcement agents, but rejected by courts and juries after considering the true evidence.

17. I have listened on several occasions to the recording of the 33 minutes of conversation between Mr. Lyles and law enforcement agents that is mischaracterized as a "confession" by the government, and have taken careful, detailed notes of its contents. I have also listened to it on one occasion with Mr. Lyles.

18. I have also examined the law and facts available to me in the context of the three counts of the indictment. I have reviewed the search warrant application and affidavit (which had not been unsealed at the time of the detention hearing) and also ascertained other details and background with respect to Mr. Lyles' criminal history and his possession of weapons found at his residence, that were not available to previous counsel and to the Court.

19. In its detention order, the Court stated that Mr. Lyles "was likely to serve at least 10 years, which is buttressed by the strength of the government's case and the fact that he confessed to the charges. . . . He therefore has a strong incentive to flee." [Detention Order, P. 2, ¶ 2]. This determination was based upon claims by government agents to the Pretrial Services Officer, and by the government at the detention hearing itself. I will respond to these assertions based upon the *actual* conversation between Mr. Lyles and law enforcement agents at the time of his arrest on June 12, 2008:

In a 33 minutes series of questions and answers, Mr. Lyles did not confess to committing any crime whatsoever. The officers began their interrogation by falsely stating that he was not yet under arrest, although when they made this statement they had previously located the marijuana "grow" and FBI agents had already placed him in handcuffs.

Instead, the officers sought to capitalize on Mr. Lyles' sincere belief that he was permitted to grow less than 100 marijuana plants under the medical marijuana laws of the State of California. They told him that if he were in fact in compliance with California law, they would bring this "favorable information" to the attention of the "Febes" (FBI agents), clearly implying that if they did so he would not be charged. [Recorded Conversation, DS-400021, at 5:09 Minutes].

In fact, Mr. Lyles never stated that he had grown more than 100 plants at a time. Only 84 were purportedly found during the search. Therefore, the statutory mandatory minimum 5 year sentence under 21 U.S.C. § 841(a)(1) and (b)(1)(B) is unlikely to be applicable.

While he discussed previous grows in response to agents' questions, he stated that those had largely been unsuccessful, and the repetitiveness and circumstances of the agents' questioning and Mr. Lyle's responses left their applicability to any mandatory minimum sentence highly problematical. [Recorded Conversation, DS-400021, at 5:45, 12:00, 13:30, 1422, 20:02 Minutes; [Recorded Conversation, DS-400024, at 1:27, 2:30, 4:19 Minutes].

Likewise, on two separate occasions during the interrogation, the agents sought to elicit a statement from Mr. Lyles that he possessed the firearms at his residence for the purpose of "protecting the grow". On each occasion, Mr. Lyles emphatically denied that they were possessed for this purpose.

It should be noted that Mr. Lyles was not under any firearms disability at the time of the search, that all of the firearms were wholly "legal" for him to possess, that several of them were kept in a locked gun safe (for which Mr. Lyles voluntarily surrendered the key), and none were within or in the immediate vicinity of the grow room.

On the first occasion Mr. Lyles was asked, referring to the firearms: "Do you got these for club [Hells Angels Motorcycle Club, "HAMC"] business or just basically to watch your grow?" Mr. Lyles responded spontaneously: "No, this has nothing to do with my grow. This is my house man. You know. Everyone keeps a shotgun by the bed." [Recorded Conversation, DS-400023, at 1:29 Minutes].

He was then asked again, after further explaining that he possessed the weapons for home protection, "Is it protection for the grow *also*?" Mr. Lyles again emphatically stated "No!". The agent tried fishing a little further by asking, "Got any problems with the grow, and explaining that "were documenting how many

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

people get ripped-off?" Again, Mr. Lyles replied "No". Recorded Conversation, DS-400023, at 2:25 Minutes].

Therefore, Mr. Lyles certainly did not admit any facts to support the charge in Count Two of the indictment that he violated 18 U.S.C. § 924(c) by using or carrying a firearm during or in relation to a drug trafficking crime, or that he possessed a firearm in furtherance of the marijuana trafficking offense charged in Count One, and certainly did not "confess" to such a firearm offense.

20. Therefore, in the absence of any confession or even admission to committing any of the three offenses charged in the indictment, including the two that each carry 5 year mandatory minimums, and without evidence of the presence of greater than 100 plants, or conclusive facts supporting the prosecution's theory that Mr. Lyles possessed firearms for a prohibited purpose related to the marijuana grow, the likelihood of the prosecution succeeding on either of these charges is highly problematical, hardly rising to the level of "likely". The government has no more than, at best, a mere *possibility* of meeting its burden of proof beyond a reasonable doubt on each of them.

21. If convicted of growing less than 100 plants, Mr. Lyles' advisory Sentencing Guideline, based upon the calculation that one plant equals 100 grams of marijuana, his possession of 85 plants would equal well less than 10 kilograms, yielding a Base Offense Level of 14, or a range 15-21 months in Criminal History Category I, and only 21-27 months if Mr. Lyles were Category III.

22. In addition to the foregoing, having reviewed the search warrant application, affidavit, and return, and based upon conversations with Mr. Lyles, and reviewing discovery reports about the search, it is not unlikely that the Court will suppress all evidence seized, thereby requiring dismissal of the instant charges. There are legitimate arguments that

the search warrant affidavit is facially deficient; that it contains material misstatements and omissions of facts that are essential to a finding of probable cause; that the search warrant was overly broad; that the **29 member FBI Swat Team** violated the explicit no-knock provision that this Court had inserted by hand into the search warrant by effecting their entry into defendant's residence using "flash bangs" [flash grenades]; that numerous items of evidence were seized without authorization in the search warrant; and that the "good faith" doctrine would not apply to save this search.

23. I respectfully suggest that if the Court had been made aware of the foregoing details, it would not have concluded that Mr. Lyles had a "strong incentive to flee" based upon "the strength of the government's case".

24. The Court also found that Mr. Lyles "has the ability to flee . . . [having] traveled extensively throughout the United States and internationally." It also asserted that Mr. Lyles financial history disclosed that he was "living beyond his means", and therefore might have "access to concealed funds with which to finance his flight." This conclusion was based in part upon the inaccurate information from the government that defendant had "confessed" to having operated a large marijuana growing facility that had since been downsized.

> In fact, almost all of Mr. Lyles' domestic travel, and all of his international travel, was paid for by the HAMC, on behalf of which he undertook these trips. The HAMC either reimbursed him for his travel expenses, or paid for them directly in the first instance. I have attached hereto as "Exhibit A", with bank account numbers redacted, receipts for Mr. Lyles' South Africa trip showing such third party payment. Therefore such travel did not indicate that he was living beyond his means.
>
> In regard to the allegation of operating a "large marijuana growing facility", Mr. Lyles told the agents "I didn't get shit out of fucking 2-3 harvests". [Recorded

Conversation, DS-400021, at 5:55 Minutes]. "I haven't had a good harvest in so long. Most I've ever gotten out of here is 5-6 pounds." [Recorded Conversation, DS-400021, at 12:00 Minutes].

In regard to conjecture that Mr. Lyles may have concealed funds with which to flee, the facts are to the contrary. He explained to the agents, in response to their question about the location of his motorcycle, that his driver's license had been suspended for non-payment of fines. [Recorded Conversation, DS-400021, at 17:08 Minutes]. When asked why he didn't just pay them, Mr. Lyles explained that he owed Mendocino County "a couple of grand" and "several hundred to Sonoma County." He also told them that he was overdrawn on his bank account. He also explained that he operated a silkscreen T-shirt business and was trying to get a tanning salon going. [Recorded Conversation, DS-400021, at 17:25 Minutes].

Thus Mr. Lyles not only clearly lacks incentive to flee; he also lacks financial resources with which to do so.

25. I also wanted to briefly address Mr. Lyle's failure to appear in court in Ukiah on November 28, 2007. I spoke with Attorney Patrick Ciocca, who represented him in that case. Mr. Ciocca explained that he had *instructed* Mr. Lyles *not to appear* on that date, and assumed complete responsibility for it. His instruction to Mr. Lyles was based solely upon a miscommunication between Mr. Ciocca and the prosecutor handling the matter for the Mendocino County District Attorney. The matter was immediately rectified when Mr. Lyles promptly appeared and posted a new bond. I asked Mr. Ciocca to submit a declaration explaining the circumstances in support of the instant motion. Mr. Ciocca's declaration is attached hereto as "Exhibit B".

26. In its detention order, the Court stated that it believed conditions of release could be fashioned to address the issue of flight; however "[o]f greater concern is the defendant's affinity for guns and violence". [Detention Order, P. 3, ¶ 5]." Based upon a review of his criminal history provided to me in the government discovery, conversations with

counsel who represented him in the cases in question, and with Mr. Lyles, I believe that there are facts that would ease the Court's concern on the issue of pretrial release and whether defendant's release would pose a danger to any other person or the community.

27. The Court mentioned all of the weapons, including the firearms that were seized at his home during the search, as one source of its unease in this regard. I respectfully suggest that the following facts and information should ameliorate those concerns.

**All firearms were legally possessed by Mr. Lyles.**

Mr. Lyles is not a felon, and was under no federal or state firearms disability at the time of the search and seizure.

Mr. Lyles had been instructed on the safe use and storage of firearms from the time he was a young boy. Indeed, a number of the firearms seized at his home were kept in a locked gun safe. Mr. Lyles voluntarily surrendered the key to that safe to law enforcement agents during the search. [Recorded Conversation, DS-400021, at 7:29 Minutes].

In the same vein, Mr. Lyles' misdemeanor arrest on October 31, 2007 for CCW in a vehicle was dismissed because the weapon was an *unloaded pistol*, registered to Mr. Lyles, which had been placed inside of a *locked gun bag*, which in turn had been *placed in the trunk of the vehicle* that Mr. Lyles was driving. Thus Mr. Lyles committed no firearm violation on that occasion, but instead had fully complied with proper gun handling procedures.

All of the firearms seized during the June 2008 search were "legal"; none had improperly modified or altered.

Likewise, Mr. Lyles' first arrest for carrying a concealed firearm in a vehicle and in a public place was dismissed. There was no allegation in that case that the firearm in question was in any way altered, stolen, or otherwise per se unlawful for him to possess.

**None of defendants' arrests for "assaultive behavior" involved allegations that a dangerous weapon had been used, displayed or brandished in any manner whatsoever.**

His arrest in Placerville on July 3, 2003 was for obstructing and impeding a police officer, and there was no allegation that he had used a weapon. The incident was

at closing time at a bar, and Mr. Lyles, then age 23 , was admittedly drunk at the time and acted inappropriately. He accepted responsibility for his actions by pleading guilty, and receiving a 10 day jail sentence and 24 months probation. He was not charged with any violation of that probation.

Likewise, the charge wherein Mr. Lyles pled guilty to challenge to fight in a public place in Willets on September 1, 2005, did not involve any allegation that weapons were possessed, used or displayed.

**Mr. Lyles had not been charged with assaultive behavior of any kind whatsoever in the 3 years preceding his arrest on the instant charges.**

The three charges against Mr. Lyles for assaultive behavior all involved excessive use of alcohol, and the most recent occurred when he was under the age of 25. He is now almost 28, and has learned to act more responsibly in public.

28. In this regard, it should be noted that the law enforcement officers were willing to remove the handcuffs from Mr. Lyles while they conducted their interrogation and search on June 12, 2008. They accepted Mr. Lyles' promise that he would not create any problems if they did so.

Mr. Lyles was asked by the officer: "We're not going to need these handcuffs on you, are we?" Defendant replied "No", and they then removed the "FBI handcuffs". [Recorded Conversation, DS-400021, at 1:31 – 2:30 Minutes].

The handcuffs were left off of Mr. Lyles for the remainder of the recorded conversation, and there no untoward incidents.

29. The Court also expressed its concern with non-firearms weapons seized during the search of defendant's residence, especially a mace, saps and brass knuckles. Mr. Lyles was brought by the agents, uncuffed, into the direct proximity of these weapons, ***all of which were discovered openly displayed on the fireplace mantle***. In response to questions from the interrogating agents, Mr. Lyles explained that he collected weapons for an arms'

1

2

display he was creating, an explanation that appeared to be understandable to the agents, and elicited no negative response.

> One of the agent's directed Mr. Lyles: "Step by the fireplace. There's brass knuckles, a leather sapper and club with nails." Mr. Lyles responded that he "collected all that stuff for years."

> He was then asked if there were any more weapons like that at the house, and Mr. Lyles truthfully replied: "No." [Recorded Conversation, DS-400022, at 0:15 Minutes].

> Mr. Lyles further explained that he "just picked all this stuff up – trying to get a little display going on." [Recorded Conversation, DS-400023, at 1:02 Minutes].

> One of the agents, understanding this purpose, responded in a teasing manner: "Troy's mantle is a little nicer than yours." Mr. Lyles replied: "Is it?" The officer then rejoined: "He's got a whole room." The officer was referring to the weapons display of another member of Mr. Lyles' HAMC Chapter that he had viewed during another search.

30. The Court noted that it did not "accept defendant's rejoinder that he needs all these weapons because there are bears in Willets or because he lives in a rural environment." [Detention Order, P. 3, ¶ 5]. Mr. Lyle's responses at the time of his arrest demonstrate that this was not some form of last-second courtroom justification.

> As noted above in Section 19 of this Declaration, the interrogating officers twice attempted to get Mr. Lyles to state that he possessed the firearms to protect the grow, which he vigorously denied.

> He emphasized that "This has nothing to do with my grow -- this is my house, man. You know. Everyone keeps a shotgun by the bed." [Recorded Conversation, DS-400023, at 1:29 Minutes].

> In the foregoing statement, Mr. Lyles was simply expressing the prevailing community ethic in Willets, where most residents routinely keep firearms for home protection. In point of fact, there are bears in Willets, and also rattlesnakes and other creatures that can cause harm, as well as isolation from immediate help when needed. He explained that the double-barrel shotgun was for his "[female] roommate when she's home alone."

31. The constitutional right to possess firearms for persons who, like Mr. Lyles, were not under any statutory disability, was recently reaffirmed by the United States Supreme Court in *District of Columbia v. Heller*, 128 S. Ct. 2783; 171 L. Ed. 2d 637 (2008). Many Americans choose not do so, either on principle or for safety concerns.

32. However, although collecting and displaying weapons may not be everyone's choice of hobby, it is respectfully suggested that it was neither illegal, abnormal, nor morally wrong for Mr. Lyles to choose to do so. Equally important is that the Court's concern in regard to defendant's possession of these weapons could be addressed by the standard condition of release that prohibits possession of firearms and other dangerous weapons.

33. In its detention order the Court also found "most troubling, [that] 8 bulletproof vests were found". [Detention order, P.3, ¶ 5]. In fact, these vests were size "medium", too small to be worn by Mr. Lyles, or anyone else his size or larger. This would include most of his friends, including fellow members of his HAMC chapter. They certainly were not unlawful for him to possess at the time of their seizure.

34. Mr. Lyles was asked about these vests during the recorded interrogation at the time of his arrest, and he truthfully explained that they were simply items that he had picked up at a surplus sale, and then stuck away in a room in the garage of his house. There was no evidence that they ever had been used or could in the future be used.

> An agent asked Mr. Lyles: "What's up with the vests?" Mr. Lyles responded: I stumbled across those. I've been lugging them around since I had my [motorcycle] shop – 5 years – 4-5 years. They're all mediums. I came across those in [unintelligible] Solano."
>
> The agent then asked: "What for?" Mr. Lyles replied: "For whatever. It's not illegal. You can't do anything with them. I don't even fit into one of them, so I

just stuck them down here in the garage. I collect shit like that – army surplus."
[Recorded Conversation, DS-400024, at 3:31 Minutes].

35. The final area of concern expressed by the Court in its detention order relates to Mr. Lyles membership in the HAMC. The information was unsupported hearsay from "an FBI Special Agent" to the Pretrial Services Officer, that defendant is "believed to be a Sargeant (sic) at arms within the Hell's (sic) Angels Club, responsible for enforcing its orders and rules", and is also "believed to be a member of the 'filthy few' which, it is alleged, indicates that he is prepared to commit murder on behalf of the club." [Detention Order, P. 3, ¶ 6].

36. Based upon my knowledge of the HAMC gathered through experience over the past 35 years, as indicated above in Sections 14-16 of this Declaration, and in exhibits to be attached hereto, I know these allegations to be false and incorrect.

There was no evidence that Mr. Lyles was the Sergeant at Arms of the Sonoma HAMC chapter at the time of his arrest, although he has admittedly fulfilled that function at various times during the course of his membership.

The Sergeant at Arms in an HAMC chapter is indeed responsible for maintaining order at meetings and ensuring, on a day-to-day basis that the members comply with chapter and HAMC rules, including serving as "road captain" to maintain safety during runs. However this is not a post that is given as a matter of course to the strongest or "toughest" member of the group.

Indeed, Mr. Lyles is considerably smaller than many of the other Sonoma HAMC members, some of whom are accomplished in martial arts. The job requires negotiation and diplomacy for the very purpose of avoiding internal conflict between members. There is nothing about that function that should cause the Court concern if Mr. Lyles were to be released on conditions.

I have heard the false allegation about the "Filthy Few" for more than 30 years. I was informed by a former client, deceased Oakland HAMC member Albert Perryman, that the Filthy Few began in the late 1960s when the Northern California HAMC members went on an annual Summer "run" to Bass Lake. Mr. Perryman claimed to be a "charter

member" of the "Filthy Few", who received that appellation because they were the first to arrive, the last to depart, and were acknowledged to be the "heaviest partyers".

At some point in time, the story about the Filthy Few being "murderers" for the HAMC began to circulate among law-enforcement agencies. However that has now been discredited by former HAMC members who have become cooperating prosecution witnesses, and have no motivation to testify falsely on the subject because of their grants of extensive immunity.

For example, Patrick Matter, a 25 year HAMC member and former president of the Minnesota Chapter of the Hells Angels began cooperating with the government in 2004, after pleading guilty to drug offenses and receiving an 18 year sentence. Mr. Matter was a *prosecution* witness in two federal cases in the District of Minnesota, wherein he testified under oath about the "filthy few".

In the trial of **United States v. Jacobsen and Seydel**, Case No: 03-CR-99 RHK/AJB, before the Honorable Richard Kyle and jury, on September 1, 2004, Mr. Matter admitted on cross-examination that he had "obtained a badge called the Filthy Few". [RT, P. 145]. (A copy of the relevant transcript pages from the September 1, 2004 proceeding has been attached hereto as "C".)

Matter was then asked "Isn't it true that the badge Filthy Few before '95 was a badge you earned by killing somebody?" Mr. Matter answered: "No, it's not true." Matter was then asked: "Was the badge given to members who killed people?" Mr. Matter responded: "I don't know that for a fact", but admitted he had heard "rumors" to that effect.

Matter was next asked "Why did you get your [filthy few] patch, sir?" He responded that he and defendant Seydel, an active HAMC member, "decided that we should have a Filthy few patch and sent in for them." Counsel asked: "You just put one on? And Mr. Matter replied: "Yes, we did."

The first trial against Jacobsen and Seydel ended with a deadlocked jury. At the retrial against Mr. Jacobsen on January 27, 2005, Mr. Matter testified again for the prosecution. A copy of the relevant portion of that transcript has been attached hereto as "Exhibit D".

On cross-examination he was asked: "Tell the jury what a Filthy Few patch is?" Matter replied: "It could mean anything. It could mean you rode to Sturgis for the club [HAMC]. It could mean anything."

Matter further testified that he wore a Filthy Few patch for one year in 1994. When asked why he had worn it, Matter replied: "Prestige or to look good in the club."

Matter was again pressed: "Isn't it true that you represented to the club that you murdered somebody to get that Filthy Few patch? He again responded: "No, that's not true."

He was next asked "Isn't it true in the early 90s and late 80s, when somebody wore a filthy few patch it meant they had committed a murder?" Matter replied: "That's what people would say at times, but it not true."

When challenged with the question: "Isn't that what the Hells Angels represented to the public? That if somebody walked around with a Filthy Few patch they had murdered somebody?" He responded "Not to my knowledge."

Another cooperating prosecution witness was Michael Kramer, a former HAMC member and club officer from Arizona and Illinois, who worked closely with the ATF and DEA in investigations of criminal conduct within the Arizona HAMC and with respect to events in California, Nevada and Illinois. He was made available to Police Officers from the Netherlands as a credible witness with truthful information about the HAMC, and was interviewed by Dutch police in the company of ATF Agents.

In an interview on Thursday, July 8, 2004, with a transcript signed by Kramer and an ATF agent, he was asked by the Dutch police: "What kind of a meaning does the Filthy Few patch have?"

Mr. Kramer replied: "The original meaning was that the Filthy Few were the ones that stayed at parties longer than anyone else."

It should be noted that Mr. Kramer, whom I have never met or spoken with, echoed exactly the information that my client, the late Albert "Big Albert" Perryman had conveyed to me 25 years previously as noted above that they were the first to arrive at the Bass Lake Run (an annual party in the 1960s and 1970s), and the last to leave for home.

Mr. Kramer then expanded further on the fairy tale surrounding the Filthy Few patch. He explained that it is "more a thing to frighten guys like you, police officers, etc. It doesn't mean you have killed someone for the club."

Kramer further commented that "If you knew how many Filthy Few patches there are, there would be far more unsolved murders. . . . Filthy few is just a joke and a myth. It's just that 'Joe Public' would fear the Hells Angel member wearing a Filthy Few patch."

He noted: At the West Coast [meetings] Fooky from the Oakland charter is the one who makes the patches and hands them out to his friends. I don't think there's a difference between the meaning of Filthy few in Europe and the U.S. As far as I know the Filthy Few patches come from Oakland. Fooky is the only one who who makes them over here and gives them out. He is an old member (20-30 years). Fooky could have given me 10 of them and I could have distributed them."

A copy of the question and answer by Mr. Kramer pertaining to the Filthy Few, and a copy of the signature page from the Dutch Police interview, has been attached hereto as "Exhibit E").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

37. The person, who Mr. Kramer referred to as "Fooky", is an HAMC member from Oakland named John Fukushima. I have personally known Mr. Fukushima since 1979, have represented him from time to time in various legal matters, and know that he is often referred to by the nickname "Fuki".

38. In May 2007, Mr Fukushima testified at trial before the Honorable Roberts S. Lasnik and jury in *United States v. Fabel, et al.*, Case No: CR-06-41-RSL in the Western District of Washington in regard to his activities in making and delivering various HAMC insignia, including "Filthy Few" patches. A copy of his testimony in that proceeding has been attached hereto as "Exhibit F". His testimony included the following points that may be relevant to this Court's concern about Mr. Lyles "Filthy Few" patch:

Mr. Fukushima was 54 years old, had worked as an automotive technician for 36 years, and had been an HAMC member for 30 years. [RT, P. 7051].

I know of my own personal knowledge that Mr. Fukushima has been employed as a skilled automotive technician for various San Francisco and East Bay automobile dealerships, and that in the 1990s, he was selected by Chrysler to be part of a special team that prepared and tested advance model cars on the Utah Salt Flats.

He had been involved in the creation and sale of HAMC patches for about 28 years, in a voluntary, not for profit endeavor. He would receive requests for various types of HAMC patches, and after determining the type, color, size and numbers, he would submit an order to one of several embroiderers who would fabricate them. Included in this category were the "death-head" insignia and "rockers" for the back of HAMC vests, "city tags" for the front, and what he termed "shock value tags". [RT, P. 7052-7053].

Mr. Fukushima explained that "shock value" tags had different sayings on them such as "Dirty 30", Terror Team", "Hell on Wheels", "Wrecking Crew", "Bastard Brigade", "Frozen Few" and "Filthy Few". He said he had made thousands of them over the years, sometimes 25 to 100 in a single order. He also identified a copy of receipts for an order of 100 "Filthy Few" Tags and 500 "Red and White" [HAMC colors] supporter tags. A copy of these receipts is attached hereto as "Exhibit G". [RT, P. 7054-7055].

I am personally aware, consistent with the reality that the Filthy Few were the heaviest partyers, that "Frozen Few" patches are worn by HAMC members who have attended an annual motorcycle run and party in Alaska.

Mr. Fukushima also testified that he is no longer the only person who makes these tags for the HAMC, and that any HAMC member who called him and asked, would be sent the requested tag, including the one bearing the legend "Filthy Few". [RT, P. 7060-7061].

39. Therefore, based upon the foregoing information and evidence, the Court may safely conclude that Mr. Lyle's wearing of a "Filthy Few" patch on his vest is not a statement or boast about murder, contrary to law enforcement misinformation on the issue.

40. I believe it is also relevant to bring to the Court's attention my personal experience and knowledge with respect to the pretrial release of HAMC members in federal court over the past 35 years. Perhaps the most recent instance arose in a prosecution that began in November 2003 in the United States District Court for the District of Nevada (Las Vegas Division), *United States v. Acosta, et. al.*, Case No; 03-542, before the Honorable James Mahan. My client, Michael Smullen, an HAMC member from Richmond, California, was one of 42 defendants, all of whom were charged with Conspiracy, Violence in Aid of Racketeering (including an allegation that they did so to maintain or enhance their standing in the HAMC), and related firearm charges. The case arose from a shootout on the floor of Harrah's Casino in Laughlin, Nevada on April 27, 2002, in which 3 people were killed and others were wounded.

41. All defendants were HAMC members, or were otherwise affiliated with HAMC members, and almost all of resided outside of Las Vegas in various locations, including

Reno, Nevada, Seattle Washington, Alaska, and various California cities ranging from Sonoma (in the north) to San Diego (south).

42. Notwithstanding the charges of serious violent crimes, and their membership in the HAMC or relationship to HAMC members, and the prosecution's initial requests that they be detained, Judge Mahan ordered the release of *all but one of the defendants on signature bonds*, with travel limited only to the entirety of their respective states of residence, but permitting travel to Nevada as well. Judge Mahan also denied the government's request that they be prohibited from associating with co-defendants and with other HAMC members.

43. The first 12 of the 42 defendants did not go to trial until September 2006. After approximately 2 weeks of jury trial, the case ended with 6 defendants pleading guilty, with 5 receiving sentences in the 1-3 year range. The sixth defendant was sentenced to 5 years, concurrent with another previously imposed sentence. The cases against the remaining 36 defendants, including my client Mr. Smullen, were all *dismissed with prejudice*."

44. I believe that it is important to note that during the almost 3 years that the case was pending, not one of the defendants had his pretrial release revoked due to any act of violence. This is consistent with my experience in handling HAMC-related cases over the past 35 years. During that time, not one of my clients who had been granted pretrial release, whether in state or federal court, had his bond revoked for any reason whatsoever.

45. Based upon that experience, and the other facts of this case, I believe that if the Court were to revoke its detention order, and permit Mr. Lyles release on conditions, he would pose neither a flight risk nor a danger to any person or the community.

Dated: August 16, 2008.

Respectfully submitted:

/s/Alan P. Caplan_____
630 Carolina Street
San Francisco, CA 94107
Phone: 826-2371
Fax: 824-7148
E-Mail: apc716@pacbell.net

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2008, I caused the aforesaid Declaration in Support of defendant's Motion to Reconsider Detention Order to be electronically filed with the Clerk of this Court using the CM/ECF system which will send notification of such filing to AUSA Wai Shun Wilson Leung, and in accordance with the Local Rule of this Court, a "hard copy" will be delivered to the chambers of the Honorable Bernard Zimmerman and to the chambers of the Honorable Phyllis Hamilton.

Dated: August 16, 2008.

s/ Alan P. Caplan
Alan P. Caplan
630 Carolina Street
San Francisco, CA 94107
Phone: 826-2371
Fax: 824-7148
E-Mail: apc716@pacbell.net

# EXHIBIT A

### your trip reservation

**Booking reservation number:** YCP394

• We recommend you make a note of the booking reservation number or print this page.

#### traveller information

**Russel Lyles**

**Steven Wilson**

**Contact information**

Home phone:     SFO7075264556
Business phone:  *****PLEASE CHARGE (3375.04) AMOUNT TO THE CREDIT

#### e-ticket numbers

Only e-ticket numbers are displayed when they are issued. Paper ticket numbers are not included in the display.

**Document 016-7224286888:  San Francisco - San Francisco**  Russel Lyles
**Document 016-7224286889:  San Francisco - San Francisco**  Steven Wilson
**Document 016-2173739782:  San Francisco - Cape Town**  Russel Lyles
**Document 016-2173739783:  San Francisco - Cape Town**  Steven Wilson

#### your flight selection

**Airline confirmation number(s):** United Airlines QLW9P2 South African Airways YCP394

**San Francisco to Frankfurt**

| Flight 1 | Tuesday, April 01, 2008 | | |
|---|---|---|---|
| confirmed | **Departure:** 18:56 | San Francisco, USA -   San Francisco International , terminal I | |
| | **Arrival:**   15:00 +1 day(s) | Frankfurt, Germany -   Frankfurt International , terminal 1 | |
| | Airline:    United Airlines UA926 | Duration:   11:04 | |
| | Fare type:  Economy Restricted | Aircraft:   Boeing 777-200/300 | |
| | Baggage:   information not available | Last check in:  information not available | |
| | DINNER, BREAKFAST | | |

**San Francisco to London**

| Flight 1 | Wednesday, April 02, 2008 | |
|---|---|---|
| confirmed | **Departure:** 16:50 | San Francisco, USA -  San Francisco International , terminal I |
| | **Arrival:**   11:00 +1 day(s) | London, United Kingdom -   Heathrow , terminal 5 |

| | | | |
|---|---|---|---|
| Airline: | British Airways BA284 | Duration: | 10:10 |
| Fare type: | Business | Aircraft: | Boeing 747-400 |
| | | Last check in: | information not available |

MEAL (NON SPECIFIC)

## London to Cape Town

**Flight 1**
confirmed

| | | | |
|---|---|---|---|
| **Departure:** | 19:20 | London, United Kingdom - 5 | Heathrow , terminal |
| **Arrival:** | 07:50 +1 day(s) | Cape Town, South Africa - International | Cape Town |

| | | | |
|---|---|---|---|
| Airline: | British Airways BA059 | Duration: | 11:30 |
| Fare type: | Business | Aircraft: | Boeing 747-400 |
| | | Last check in: | information not available |

MEAL (NON SPECIFIC)

## Cape Town to San Francisco

**Flight 1**
confirmed

| | | | |
|---|---|---|---|
| **Departure:** | 19:00 | Cape Town, South Africa - International | Cape Town |
| **Arrival:** | 06:20 +1 day(s) | London, United Kingdom - 1 | Heathrow , terminal |

| | | | |
|---|---|---|---|
| Airline: | South African Airways SA220 | Duration: | 12:20 |
| Fare type: | Economy | Aircraft: | Airbus Industrie A340-600 |
| Baggage: | 20 kilogram(s) per traveller | Last check in: | information not available |

DINNER, BREAKFAST

Change of plane required. Time between flights = 3:45

**Flight 2**
confirmed

| | | | |
|---|---|---|---|
| **Departure:** | 10:05 | London, United Kingdom - | Heathrow , terminal 1 |
| **Arrival:** | 13:09 | San Francisco, USA - | San Francisco International , terminal I |

| | | | |
|---|---|---|---|
| Airline: | United Airlines UA955 | Duration: | 11:04 |
| Fare type: | Economy Restricted | Aircraft: | Boeing 747-400 |
| Baggage: | information not available | Last check in: | information not available |

LUNCH, SNACK OR BRUNCH

## Flight payment
Air Fare not Available

## Flight Notes
• Not all seat and meal options are offered on all flights.

• Specific rules and restrictions may apply to this fare.
• Taxes are included except where local airport taxes are collected at check-in time.

## Flight special requests

| | Traveller | Seat number | Seat location | Meal preference |
|---|---|---|---|---|
| Meal and seat request: | | | | |
| **San Francisco - Frankfurt** | | | | |
| Flight 1: San Francisco - Frankfurt | Russel Lyles | 42F | None specified | No special meal |
| | Steven Wilson | 42G | None specified | No special meal |

**San Francisco - London**

| Flight 1: San Francisco - London | Russel Lyles | None specified | None specified | No special meal |
|---|---|---|---|---|
| | Steven Wilson | None specified | None specified | No special meal |

**London - Cape Town**

| Flight 1: London - Cape Town | Russel Lyles | None specified | None specified | No special meal |
|---|---|---|---|---|
| | Steven Wilson | None specified | None specified | No special meal |

**Cape Town - San Francisco**

| Flight 1: Cape Town - London | Russel Lyles | None specified | None specified | No special meal |
|---|---|---|---|---|
| | Steven Wilson | None specified | None specified | No special meal |
| Flight 2: London - San Francisco | Russel Lyles | None specified | None specified | No special meal |
| | Steven Wilson | None specified | None specified | No special meal |

| Meet and assist travellers with special needs: | None specified |
|---|---|
| Wheelchairs needed: | 0 |

Indicates airline has confirmed your seat or meal requests. If it has not been confirmed within 24 hours, you may want to contact the airline directly.

miscellaneous

**WAS (Washington, District of Columbia, USA)**
Tuesday, October 21, 2008

destination information

**Frankfurt, Germany**

**Current weather**
Partly Cloudy
High: 22 ºC
Low: 18 ºC
5-day forecast

**London, United Kingdom**

**Current weather**
Partly Cloudy
High: 16 ºC
Low: 15 ºC
5-day forecast

**Cape Town, South Africa**

**Current weather**
Sunny
High: 20 ºC
Low: 8 ºC
5-day forecast

**San Francisco, USA**

**Current weather**
Partly Cloudy
High: 19 ºC
Low: 12 ºC
5-day forecast

general remarks

*** YOUR CREDIT CARD MAY SHOW ONE OR MORE CHARGES
*** WITH A TOTAL PRICE OF $3375.04 ***
CALL AIRLINE 72HRS PRIOR DEPARTURE TO RECONFIRM SC
******* NO SHOW NO MONEY ******

*TOTAL AMOUNT CHARGED FOR ALL TICKETS IS $3375.04
ST THIS IS ELECTRONIC TICKET

reservation office

WTC
5815 SEMINARY RD
FALLS CHURCH VA 22041
US
Tel:703 379 1777
Fax:703 379 6983
E-mail:CS@AIRFARE.COM

© 2008 Amadeus IT Group SA. All Rights Reserved

# EXHIBIT B

1
2 Patrick M. Ciocca
Attorney at Law
3 333 Enterprise Dr. #99
Rohnert Park, CA 94928
4 (415) 265-4200
pmcesq@hotmail.com
5

IN THE UNITED STATES DISTRICT COURT
6 FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8 UNITED STATES OF AMERICA,               )
                                          )   No: CR–08-00420-PJH-1
9                     Plaintiff,          )      3-08-70351 MAG
                                          )
10 vs.                                    )
                                          )
11 RUSSEL LYLES, JR.                      )   **DECLARATION OF ATTORNEY**
                                          )   **PATRICK CIOCCA IN SUPPORT OF**
12                                        )   **DEFENDANT LYLES' MOTION TO**
                      Defendant.          )   **RECONSIDER DETENTION ORDER**
13 _____    )

14

15     I, Patrick M. Ciocca, hereby state under the pains and penalties of perjury, as follows:

16

17 1.  I a member of the Bar of the State of California, SBA No: 219418, and I maintain my

18     office at 333 Enterprise Dr. #99 Rohnert Park, CA 94928.

19

20 2.  I was the attorney of record for Russell Alan Lyles Jr. in criminal case number MCUK

21     CRCR 07-81328-002 in Ukiah, California, Mendocino County, commencing on

22     November 28, 2007.

23

24 3.  I was informed that Mr. Lyle's failure to appear in court in Ukiah on November 28, 2007

25     may be taken into consideration by the Court in determining Mr. Lyles' suitability for

26     Pretrial Release.

27

28

4. I believe it is important that the Court understand that the only reason that he did not appear at a proceeding in that case was because I had instructed him not to do so. The surrounding circumstances will be explained in the following paragraphs of this declaration.

5. After having been retained by Mr. Lyles to represent him in Mendocino County Case No: MCUK CRCR 07-81328-002, I followed my usual course of business by contacting the Mendocino District Attorney's office not less than once a week for each of the four weeks before the date listed for Mr. Lyles' appearance on his promise to appear form, to inquire on each occasion whether a complaint had actually been filed in the matter.

6. My reason for doing so was that I had considered the charge against Mr. Lyles to meritless, and therefore believed it highly unlikely that the District Attorney would pursue the matter. It subsequently turned out that I was correct in this assessment because the case was subsequently dismissed *prior to* the preliminary examination.

7. It has also been my experience that cases in Mendocino County frequently do not proceed on the date initially calendared; therefore I routinely seek to determine ahead of time whether the case will actually proceed on the calendared date in order to schedule my appearances more effectively.

8. Each time I inquired as to Mr. Lyles' matter, I was told by representatives of the Mendocino County District Attorney's office that no case had yet been filed against him. This is not uncommon, as many cases are filed only days before the scheduled date of the arraignment.

9. However, on my last attempt to determine if a case was going to be filed against Mr. Lyles, in the late afternoon on November 27, 2007 (less than twenty-four hours before the hearing) I was assured that no case had been filed against Mr. Lyles *and further*, that no case was going to be filed against him, at least not soon enough to be heard on the following morning.

10. Based upon the foregoing circumstances, I contacted Mr. Lyles late in the day on November 27, 2007 to instruct him not to appear in court on November 28, 2007.

11. Based on subsequent information and belief, the case was in fact filed by the District Attorney's office in open court on the next morning (November 28, 2007).

12. Therefore, the sole reason why Mr. Lyles failed to appear on November 28, 2007 was because I had instructed him not to do so.

13. I take full responsibility for this error, and hope that the Court will accept the fact that Mr. Lyles was in no way personally at fault.

14. After realizing a failure to appear had been recorded in this matter, Mr. Lyles rectified the situation by posting a second bond and made each and every further hearing on this matter until it was dismissed.

15. In that regard, I am also informed that this Court about Mr. Lyles' arrest in this case for a weapons violation. That charge, carrying a concealed weapon in a vehicle was properly dismissed because the firearm in question was an *unloaded* handgun, owned by

1    Mr. Lyles, who was not then under any firearm disability, which was located in the trunk

2    of his car, and was further secured by being in a bag with a gun lock.

3

4    Dated: August 16, 2008.

5

6                                    Respectfully submitted:

7

8                                    /s/Patrick M. Ciocca_____
                                     333 Enterprise Dr. #99
9                                    Rohnert Park, CA 94928
                                     Phone: (415) 265-4200
10                                   Fax: (707) 938-1486
                                     E-Mail: pmcesq@hotmail.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

1

UNITED STATES DISTRICT COURT

2

DISTRICT OF MINNESOTA

3

4

5  - - - - - - - - - - - - - -x
                            :
6  United States of America,  :
                            :
7           Plaintiff,       :
                            :         03-CR-99 RHK/AJB
8  vs.                       :         September 1, 2004
                            :         St. Paul, Minnesota
9  Bradley T. Jacobsen,      :
   Paul Michael Seydel       :
10                           :         JURY TRIAL
           Defendants.       :
11  - - - - - - - - - - - - - -X
12

13

14         TRANSCRIPT OF TRIAL TESTIMONY

15               Volume I

16    BEFORE THE HONORABLE RICHARD H. KYLE

17         U.S. DISTRICT COURT JUDGE

18

19                 --oOo--

20

21

22

23            Robert W. Riley
       United States Court Reporter
           646 U.S. Courthouse
24         316 North Robert St.
         St. Paul, MN 55101-1459
25           (651) 848-1220

1                     examined and testified as follows:

2                            DIRECT EXAMINATION

3    BY MR. PAULSEN:

4    Q     Your name is Patrick Joseph Matter?

5    A     Yes, it is.

6    Q     How old are you?

7    A     52.

8    Q     You are presently in custody?

9    A     Yes, I am.

10   Q     How long is your sentence?

11   A     Seventeen and a half years.

12   Q     You pled guilty pursuant to a federal plea agreement, is

13   that correct?

14   A     Yes, I did.

15   Q     I'd like to go over that plea agreement with you right now.

16   You pled guilty to conspiracy to distribute methamphetamine, is

17   that right?

18   A     Yes, I did.

19   Q     In that plea agreement the government and you stipulated to

20   a certain amount of methamphetamine that the government felt it

21   was able to prove , is that right?

22   A     Yes.

23   Q     That was 1.5 kilograms but up to five kilograms of

24   methamphetamine?

25   A     Yes.

1    answer it any other way.

2    Q    Who took it off the properly if you didn't?

3    A    Tom Ridgeway.

4    Q    And he did that at your orders, correct?

5    A    No.  Tom Ridgeway brought it to me himself.

6    Q    And so I take it you deny that you obtained that pistol

7    with a silencer from his area because you had used it in a

8    murder 20 years ago.

9    A    Yes, I deny that.

10   Q    I take it also prior to 1995 when you were in a motorcycle

11   gang, the Hell's Angels, you obtained a badge called the Filthy

12   Few, is that right?

13   A    Yes, I did.

14   Q    Isn't it true that the badge Filthy Few before '95 was a

15   badge you earned by killing somebody?

16   A    No, it's not true.

17   Q    Was the badge given to members that killed people?

18   A    I don't know that for a fact.

19   Q    You don't know for a fact, but that's the story, isn't it?

20   A    There's rumors to that, yes.

21   Q    Why did you get your patch, sir?

22   A    I believe Paul Seydel and I decided that we should have a

23   Filthy Few patch and sent in for them.

24   Q    You just put one on?

25   A    Yes, we did.

1   A    I have had some barroom brawls, yes.

2   Q    Barroom brawls with the Hell's Angels, it's usually all you

3   guys against one or two people, correct?

4   A    I don't know about that.

5   Q    When somebody would get down, when somebody would start

6   losing a fight with the Hell's Angels, they usually ended up in

7   the hospital.  You never stopped after the guy went down, did

8   you?

9   A    Hell's Angels prided themselves on a one-on-one fight.

10  Q    They do.  And with respect to the Minnesota chapter of the

11  Hell's Angels, you have a web site, correct, that you put on?

12  A    Yes, I do.

13  Q    And on that web site are various documents telling what a

14  Hell's Angel is, correct?

15  A    Not on my web site, no, there is not.

16  Q    Hell's Angels Minnesota dot com, is that the Hell's Angels

17  web site?

18  A    I have one for my business.  Which one are you referring

19  to?

20  A    I'm referring to the Hell's Angels one.

21  A    Okay.

22  Q    You are aware of that web site, right?

23  A    Yes.

24  Q    And that's the Hell's Angels Minnesota web site, correct?

25  A    I believe it's under Hell's Angels Minnesota dot com.

1    A    Yes.

2    Q    He gets you cocaine and methamphetamine, correct?

3    A    Al Brown at that time was selling me cocaine.

4    Q    And by the way, Texas and California are both what are

5    called border states, right?

6    A    I don't know.

7    Q    Well, do you know where all these drugs come from?

8    A    No, I don't.  I never asked.

9    Q    I'm going to ask you some questions about the Hell's

10   Angels, and I'm going to ask you if they're true or false, okay?

11        In order to get into Hell's Angels, you have to commit

12   a felony.  True or false?

13   A    False.

14   Q    In order to get into Hell's Angels, committing a felony

15   will shorten the prospect's period of time.

16   A    No.

17   Q    In the 1970s, the Hell's Angels -- strike that.  During the

18   late '60s, were you familiar with the Hell's Angels in the late

19   '60s, or is that too far back?

20   A    No.

21   Q    We'll move up to the '70s

22                MR. MOHS:  Objection, Your Honor, relevance, 403.

23                THE COURT:  How many questions?

24                MR. GRAY:  It's not too long.

25                THE COURT:  How many?

# EXHIBIT D

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA


- - - - - - - - - - - - - - - -x
                     :

United States of America,     :
                     :
        Plaintiff,     :
                     :      04-CR-99 RHK/AJB
vs.                   :      January 27, 2005
                     :      St. Paul, Minnesota
Bradley T. Jacobsen,      :
                     :      JURY TRIAL
        Defendant.     :
                     :
- - - - - - - - - - - - - - - -X


PARTIAL TRANSCRIPT OF PROCEEDINGS

(Testimony of Patrick Matter)

BEFORE THE HONORABLE RICHARD H. KYLE

U.S. DISTRICT COURT JUDGE


--oOo--


Robert W. Riley
United States Court Reporter
646 U.S. Courthouse
316 North Robert St.
St. Paul, MN 55101-1459
(651) 848-1220

1          Transcript of testimony of Patrick Matter given before

2    the Honorable Richard H. Kyle, one of the judges of the above

3    court, Courtroom No. 4, U.S. Courthouse, St. Paul, Minnesota,

4    January 27, 2005.

5    APPEARANCES:

6    On behalf of the Plaintiff:

7         Jeff Paulsen
          Assistant U.S. Attorney
8         600 U.S. Courthouse
          330 4th St. S.
9         Minneapolis, MN 55415

10   On behalf of the Defendant Jacobsen:

11        Gray & Malacko
          332 Minnesota St., Suite W 1610
12        St. Paul, MN 55101
          by Earl P. Gray, Esq.
13

14                         --oOo--

15

16

17

18

19

20

21

22

23

24

25

1                          PATRICK MATTER,

2                 having been first duly sworn, was

3                 examined and testified as follows:

4                        DIRECT EXAMINATION

5    BY MR. PAULSEN:

6    Q    Mr. Matter, you are presently in custody, is that right?

7    A    Yes, I am.

8    Q    As a result of pleading guilty to federal methamphetamine

9    conspiracy charges and money laudering?

10   A    Yes, sir.

11   Q    Before we get into that, a little bit of background on you.

12   How old a man are you?

13   A    I am 53.

14   Q    Married?

15   A    Yes, I am.

16   Q    Children?

17   A    Yes, I have.

18   Q    How old?

19   A    I have got a son five, a son 18, one 28 and one 33.

20   Q    Your wife still live in the area?

21   A    Yes, she does.  She lives in Corcoran, Minnesota.

22   Q    Where you used to live before you went to prison?

23   A    Yes, sir.

24   Q    Any children there?

25   A    Yes, I have a five-year-old son that lives at the address

1   Angels Motorcycle Club?

2   A    That's correct.

3   Q    Focusing on the Minnesota chapter, you were the president

4   of it?

5   A    Yes, I was.

6   Q    When was that club formed.

7   A    1981.  We got our charter September 18, 1982.

8   Q    You were the president up until the time, when?

9   A    I was incarcerated November 25th, 2003.

10  Q    Who was the vice president?

11  A    Paul Seydel.

12  Q    Did he have a nickname?

13  A    Rooster.

14  Q    Was he the vice president the whole time?

15  A    Pretty much so, yes.

16  Q    Was there a Richard *Rhoda in the club?

17  A    Yes, there was.

18  Q    What was his role or title?

19  A    He was sergeant of arms and road captain.  He made sure

20  motorcycles were ready to go on runs, and when we was ready to

21  leave for runs, that everybody was there and present.

22  Q    What was the number of members in the Hell's Angels

23  Motorcycle Club?

24  A    Eight to 15 at different times in Minneapolis.

25  Q    Were the members of the Hell's Angels Motorcycle Club

```
 1   Q    Sarcastic when you said, Matter told them they should have
 2   used a larger caliber firearm.  That was being sarcastic?
 3   A    I said that to the agent at the time when he was talking to
 4   me.  I believe that's the context it came out in.  I don't know
 5   how he took it.
 6   Q    Well, did these two fellows want their Filthy Few patches
 7   for their attempted murder?
 8   A    They wanted there Filthy Few tags, yes.
 9   Q    Tell the jury what a Filthy Few patch is.
10   A    It could mean anything.  It could mean you rode to Strugis
11   for the club.  It could mean anything.
12   Q    How long have you had a Filthy Few  patch, sir?
13   A    I had a Filthy Few patch I wore for one year.
14   Q    How long ago was that?
15   A    I believe I put it on in the '90s, '94 for a year.
16   Q    Why did you put that on?
17   A    Prestige or to look good in the club.
18   Q    Isn't it true that you represented to the club that you
19   murdered somebody to get that Filthy Few patch?
20   A    No, that's not true.
21   Q    Isn't it true that in the early '90s and late '80s, when
22   somebody wore a Filthy Few patch it meant they had committed a
23   murder?
24   A    That's what people would say at times but that's not true.
25   Q    Isn't that what the Hell's Angels represented to the
```

1   public?   That if somebody walked around with a Filthy Few patch

2   they had murdered somebody?

3   A    Not to my knowledge.

4   Q    What about the New York chapter of the Hell's Angels?

5   A    What about them?

6   Q    Do you know anything about them?

7   A    I know some of the members from there, yes.

8   Q    Did you every talk to Richard Rhoda about the New York

9   chapter?

10  A    I talked to him about the New York chapter, yes.

11  Q    And in the New York chapter in order to get in the gang,

12  you have to murder somebody?

13  A    That's not true.

14  Q    Did you tell Richard Rhoda that?

15  A    I don't believe I did.

16  Q    To your knowledge have some of these Hell's Angels

17  committed murder?

18  A    Not to my knowledge, no.

19  Q    And now the bombing of the Outlaw Tattoo shop.   That was in

20  Milwaukee?

21  A    Yes, sir.

22  Q    And that was done by John Dirks and Charles Goldsmith, is

23  that right?

24  A    That's true.

25  Q    And this was an actual bombing of a building?

# EXHIBIT E

Q: What kind of a meaning does the Filthy Few patch have?

A: The original meaning was that the FF were the ones that stayed at parties longer than anyone else.

The FF patch is more a thing to frighten guys like you, police officers etc. It doesn't mean that you have killed someone for the club. If you know how many FF patches there are, there would be far more unsolved murders. At the West Coast Fooky from the Oakland charter is the one who makes the patches and hands them out to his friends. FF is just a joke and a myth. It's just that "Joe Public" would fear the HA member wearing a FF patch.

I don't think that there is a difference between the meaning of FF in Europe and the US. As far as I know the FF patches come from Oakland. Fooky is the only one that makes them over here and gives them out. He is an old member (20 to 30 years). Fooky could have given me ten of them and I could have distributed them. A Dutch member wearing a FF patch would probably not have received it from Fooky but from someone else manufacturing these patches in Europe.

The reputation of a FF is that they are tough guys.

It's not that the FF are like an elite group, like the SS under Hitler.

Proces verbaal verhoor getuige                    Pagina 4 van 9

ATF_000957

After having read this statement to the witness, the witness signed for it as being a correct account of what he stated.

Witness:

A.T.F. officer

The above interview with the witness took place on Wednesday July 7, 2004 from 3.00 pm to 6.30 pm and was continued on Thursday July 8, 2004 from 9.00 am to 1.00 pm.

During the interview the officers 20373 and 23076 of the Netherlands Police Agency and their interpreter were present.

Proces-verbaal verhoor getuige                                  Pagina 9 van 9

ATF_000962

# EXHIBIT F

Case 3:08-cr-00420-PJH   Document 15   Filed 08/16/2008   Page 49 of 67
Case 2:06-cr-00041-RSL   Document 898   Filed 09/21/2007   Page 1 of 223

6896

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF WASHINGTON
 2                        AT SEATTLE

 3
      UNITED STATES OF AMERICA,        )
 4                                     )        Case No. CR06-41RSL
                            Plaintiff, )
 5                                     )        Seattle, Washington
             v.                        )
 6                                     )        May 14, 2007
      RODNEY ROLLNESS,                 )
 7    JOSHUA BINDER,                   )
      RICHARD FABEL, and               )
 8    RICKY JENKS,                     )
                                       )
 9                          Defendants.)
                                       )
10    _____)

11

12                   TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE ROBERT S. LASNIK
13              UNITED STATES DISTRICT JUDGE

14

15    For the Plaintiff:    Susan Harrison
                            Michael J. Lang
16                          Tessa M. Gorman
                            Bruce F. Miyake
17                          Assistant U.S. Attorneys
                            700 Stewart Street, Suite 5220
18                          Seattle, Washington  98101-1271

19    For the Defendant     Todd Maybrown
      Rodney Rollness:      Allen, Hansen & Maybrown
20                          600 University Street, Suite 3020
                            Seattle, Washington  98101
21
                            Jeffrey E. Ellis
22                          Ellis, Holmes & Witchley
                            705 Second Avenue, Suite 401
23                          Seattle, Washington 98104

24    For the Defendant     Gilbert H. Levy
      Joshua Binder:        Attorney at Law
25                          2001 Western Avenue
                            Market Place Two, Suite 200
```

Case 3:08-cr-00420-PJH    Document 15    Filed 08/16/2008    Page 50 of 67
Case 2:06-cr-00041-RSL    Document 898    Filed 09/21/2007    Page 2 of 223

6897

```
 1                                   Seattle, Washington 98121
                                     Terrence Kellogg
 2                                   Attorney at Law
                                     720 Third Avenue
 3                                   1900 Pacific Building
                                     Seattle, Washington 98104
 4
         For the Defendant           Kristine A. Costello
 5       Richard Fabel:              Costello & Associates
                                     1000 Second Avenue, Suite 1780
 6                                   Seattle, Washington 98104

 7                                   Peter A. Camiel
                                     Attorney at Law
 8                                   710 Cherry Street
                                     Seattle, Washington 98104
 9
         For the Defendant           Cassandra L. Stamm
10       Ricky Jenks:                Horwitz & Stamm
                                     119 First Avenue South, Suite 500
11                                   Seattle, Washington 98104

12                                   Barry L. Flegenheimer
                                     Bell, Flegenheimer & Leong
13                                   119 First Avenue South, Suite 500
                                     Seattle, Washington 98104
14

15       Barry L. Fanning
            and
16       Susan A. Zielie
         Official Court Reporter
17       700 Stewart Street, Rm. 17204
         Seattle, Washington 98101
18       (206) 370-8507

19

20

21

22

23

24

25
```

```
 1          MR. LANG:  I will object to the leading nature of the
 2   question, your Honor.
 3          THE COURT:  It is leading.  I will allow it.  If you
 4   know.
 5          THE WITNESS:  Yes, that would be a good example of a
 6   snitch.
 7          MR. CAMIEL:  Thank you.
 8          MR. LANG:  Nothing further.
 9          THE COURT:  Thanks, Mr. Nakayama.  You are excused.  You
10   can step down.  You are done.
11          MR. CAMIEL:  Your Honor, if I could get the next
12   witness?
13          THE COURT:  Please do, Mr. Camiel.  For the record then,
14   Mr. Camiel.
15          MR. CAMIEL:  John Fukushima.
16   Whereupon,
17                        JOHN FUKUSHIMA
18   Called as a witness, having been first duly sworn, was examined
19   and testified as follows:
20          THE CLERK:  Please state your full name and spell your
21   last name for the court reporter.
22          THE WITNESS:  John Fukushima, F as in Frank
23   U-K-U-S-H-I-M-A.
24                        DIRECT EXAMINATION
25   By Mr. Camiel:
```

| | | |
|---|---|---|
| 1 | Q | Mr. Fukushima, what city do you live in? |
| 2 | A | San Leandro, California. |
| 3 | Q | Is that near Oakland? |
| 4 | A | Yes. |
| 5 | Q | How old are you? |
| 6 | A | 54. |
| 7 | Q | What do you do for a living? |
| 8 | A | I am an automotive technician. |
| 9 | Q | How long have you been doing that? |
| 10 | A | 36 years. |
| 11 | Q | And you are a member of the Hells Angels? |
| 12 | A | Yes, I am. |
| 13 | Q | What charter are you a member of? |
| 14 | A | Currently Oakland. |
| 15 | Q | How long have you been with the Hells Angels? |
| 16 | A | 30 years in October. |
| 17 | Q | With Oakland the whole time? |
| 18 | A | No. |
| 19 | Q | What other charters have you been with? |
| 20 | A | San Francisco. |
| 21 | Q | Over the years have you been involved in the creation of and |
| 22 | | selling of Hells Angel patches? |
| 23 | A | Yes. |
| 24 | Q | How long have you been doing that? |
| 25 | A | For about 28 years. |

1   Q   How did you first get into it?

2   A   I took it over as a voluntary thing from whoever was doing

3   the patches before. I don't recall who that was.

4   Q   Is it a money making business?

5   A   No.

6   Q   How do you go about creating and making patches for the club?

7   A   I would get a phone call, let's say someone wants to order a

8   particular patch, they tell me what they would like. I ask them

9   what size, what colors and submit an order.

10  Q   And do you work with different embroiderers to do that?

11  A   Yes, I do.

12  Q   When you started out making patches for the club were there a

13  lot of different members doing that?

14  A   No, there wasn't.

15  Q   Were you one of the only ones?

16  A   I would say one of maybe two or three.

17  Q   Has that changed over time?

18  A   Yes, it has.

19  Q   What are the different kinds of patches that you have made

20  for club members?

21  A   I have made our club logos, the back patch that we wear.

22  Q   That's on the back of the vest?

23  A   Yes. I have made the city tags that come on the front,

24  country tags, and also just a little what I would call shock

25  value tags.

1   Q   "Shock value tags?"

2   A   Yes.  That is my --

3   Q   Let's start with the patches on the back.  There is something

4   we have heard of as a top rocker?

5   A   Correct.

6   Q   You make those?

7   A   Not anymore.

8   Q   You used to make them?

9   A   Yes.

10  Q   When did you stop making those?

11  A   1988.

12  Q   And then the center patch, that is the death head, right?

13  A   Yes.

14  Q   And did you make those at one time?

15  A   Yes.

16  Q   And then the bottom rocker, what is usually on the bottom

17  rocker?

18  A   Country or state.

19  Q   And did you make these just for members here in the United

20  States or did you make them for clubs -- charters that were

21  outside the US?

22  A   I made them for charters worldwide.

23  Q   And then on the front, you have already described some of the

24  tags.  You mentioned the shock value tags.  What are those?

25  A   They can have different sayings on there, Dirty 30, Terror

```
 1 |   Team, Hell on Wheels.
 2 | Q   How about Wrecking Crew?
 3 | A   Wrecking Crew could be one.
 4 | Q   Bastard Brigade?
 5 | A   Yes.
 6 | Q   How about Frozen Few?
 7 | A   Yes.
 8 | Q   You made that too?
 9 | A   Yes.
10 | Q   Over the years how many patches do you think you have made
11 |   for club members, over all the years you have been doing it?
12 | A   In the thousands.
13 | Q   And did you also make a tag called the Filthy Few tag?
14 | A   Yes, I have.
15 | Q   Do you know how many years you have been making that one?
16 | A   Since '78.
17 | Q   How many of those do you think you have made?
18 | A   Over a thousand.
19 | Q   And did you make them just one at a time or did you ever
20 |   order them in bulk?
21 | A   Some orders are in bulk, some are smaller quantities, 25 at a
22 |   time, hundred at a time.
23 | Q   Are you the only one who makes that particular tag?
24 | A   Not currently.  At one time.
25 | Q   You used to be the only one?  I will show you what has been
```

1   marked as 792.1.  Do you recognize that on the screen?

2   A   Yes, I do.

3   Q   What is that?

4   A   That is a receipt for an order for 100 Filthy Few tags.

5   Q   And there is another kind of tag there?

6   A   500 red and white supporter tags.

7   Q   Now, the supporter tags, are those for members or nonmembers?

8   A   They are for sale to the public.

9   Q   So you made things that the chapters could sell to

10  nonmembers?

11  A   Yes.

12  Q   And in this case this invoice shows 100 of the Filthy Few

13  tags?

14  A   That's correct.

15  Q   What is the date of this invoice?

16  A   March 6th, 1996.

17          MR. CAMIEL:  Your Honor, I would offer 792.1.

18          MR. MIYAKE:  We don't have any objection, your Honor.

19          THE COURT:  All right.  792.1 is admitted into evidence.

20          MR. LANG:  Likewise with the next exhibit, we have no

21  objection.

22          MR. CAMIEL:  This is 792.2.

23          THE COURT:  792.2 is admitted into evidence.  You can

24  publish it.

25  By Mr. Camiel:

```
 1  Q   Is this another invoice showing a quantity of Filthy Few
 2  tags?
 3  A   Yes, it is.
 4  Q   Now, is this a situation -- this is an order with a
 5  particular embroiderer?
 6  A   At this time I was using a company called Cal Emblem.
 7  Q   So you would put in an order to them and they would send you
 8  this invoice?
 9  A   Correct.
10  Q   Do you still use the same outfit to make the tags or do you
11  use somebody else now?
12  A   No, I use somebody else now.  This company was bought out by
13  Kim's Embroidery.
14          MR. CAMIEL:  I will show you one other exhibit.
15          MR. MIYAKE:  No objection to this as well.
16          MR. CAMIEL:  This is 726.1.
17          THE COURT:  726.1 is admitted into evidence.
18  By Mr. Camiel:
19  Q   Is that you?
20  A   Yes, it is.
21  Q   What is that a picture from?
22  A   The picture was taken for a calendar right around 1995 or
23  '96, I am guessing.
24          MR. CAMIEL:  That's all I have.
25          THE COURT:  Any other questions on the defense side?
```

```
 1    Mr. Miyake, any questions for Mr. Fukushima?
 2                           CROSS-EXAMINATION
 3    By Mr. Miyake:
 4    Q    Good afternoon.
 5    A    Hello.
 6    Q    Have you lived in the bay area all your life?
 7    A    Yes, I have.
 8    Q    Giants fan or Oakland As fan?
 9    A    Neither.
10    Q    Do you know Rick Fabel?
11    A    Yes, I do.
12    Q    And how long have you known him?
13    A    Approximately 20 years.
14    Q    And you have actually been to the Spokane clubhouse?
15    A    Yes.
16    Q    How many times have you been to the Spokane clubhouse?
17    A    I believe twice.
18    Q    And was one of those for Mr. Fabel's ten year anniversary?
19    A    I couldn't recall.  I believe so.
20    Q    I would like to show you a photograph that is government's
21    Exhibit 213.1.  There is a little glare in there.  Do you
22    recognize anyone in this photograph?
23    A    Yes, I do.
24    Q    Do you see yourself in there?
25    A    Yes.
```

```
 1              MR. LANG:  We would offer 211.1.

 2              MR. CAMIEL:  No objection.

 3              THE COURT:  211.1 is admitted.  213.1?

 4              MR. MIYAKE:  213.1.  I apologize.

 5    By Mr. Miyake:

 6    Q   This is yourself there?

 7    A   Yes.

 8    Q   You actually don't make the patch yourself?

 9    A   No, I subcontract.

10    Q   You subcontracted?

11    A   Yes.

12    Q   You find people to make it and then fill the order?

13    A   That's correct.

14    Q   And you have been doing that for how long?

15    A   28 years.

16    Q   So a long time?

17    A   Yes.

18    Q   And when somebody calls in you have to have some type of

19    record of what they are ordering and who it goes to?

20    A   No.

21    Q   Well, how would you fill the order then?

22    A   I would take -- Let's say, for example, you called me up.  I

23    would ask you how many patches you want, you give me a number, I

24    write it down, I ask you what you would like on it and what

25    color, what size.  I would fax it over, or now e-mail it, to the
```

1  emblem company. When it is done they send me the order and I pay

2  the bill.

3  Q  Understood. But then you need to know who ordered it, where

4  to send it?

5  A  Yes.

6  Q  So you must keep some notes or some record of that, or you

7  have?

8  A  Just handwritten.

9  Q  The records that were shown to you, are these the only

10  records of the Filthy Few patch that you have?

11  A  That is all I have at this time.

12  Q  So for the 28 years the only records you have are the one

13  from March 6th, 1996 for 100 Filthy Few patches; is that right?

14  A  Yes.

15  Q  And August 18th of 1995?

16  A  Yes.

17  Q  Just so I'm clear, can any member call you up and order the

18  patch?

19  A  Yes.

20  Q  And do you recall whether or not you have filled any order

21  for a Filthy Few patch from members of the Washington Nomads

22  chapter?

23  A  No, I don't recall.

24  Q  So you don't have any memory of filling an order from Rod

25  Rollness?

```
 1   A    No, I don't.

 2   Q    Josh Binder?

 3   A    No, I don't.

 4   Q    Ricky Jenks?

 5   A    No, I don't.

 6   Q    Or Tim Myers?

 7   A    No, I don't.

 8   Q    Did an individual or Washington Nomads chapter by the name of

 9   Ron Arnone ever call and place an order for a Filthy Few patch?

10   A    I don't even know that name.

11   Q    Now, you say you are not the only person that fills these

12   orders?

13   A    That's correct.

14        MR. MIYAKE:  If I could have just a moment?  I don't

15   have anything further.

16        THE COURT:  Thank you, Mr. Miyake.  Mr. Camiel, do you

17   have another question or two?

18        MR. CAMIEL:  Two.

19                       REDIRECT EXAMINATION

20   By Mr. Camiel:

21   Q    Mr. Fukushima, why did you keep those two invoices of the

22   large quantities of Filthy Few patches?

23   A    That particular invoice was for a Filthy Few patch that we

24   had for a ride to Sturgis and Laconia.  And that came up in

25   another bail hearing for another individual.  And I just happened
```

1   to have those receipts, so I presented them at that time.

2   Q   And Mr. Miyake asked you whether any member could call you up

3   and order such a patch. Does it have to be the president of the

4   club that calls up?

5   A   No.

6   Q   Any member?

7   A   Any member.
    ~   ~~~~ ~~ ~~~ ~~~~~~~~~ ~~~~ ~~ ~~ ~~~ ~~~ ~~~~~~ ~~~

9   A   No.

10  Q   So if he calls you up, if he is a member he can have one?

11  A   Yes.

12          MR. CAMIEL:  Nothing further.

13          MR. MIYAKE:  Your Honor, I don't have anything further

14  for Mr. Fukushima.

15          THE COURT:  Thank you, Mr. Fukushima. You can step

16  down.  Thank you very much for coming up.

17          MR. MIYAKE:  We do have a matter we would like to raise

18  with the Court on a future point.

19          THE COURT:  Ms. Stamm, you have the next witness?

20          MS. STAMM:  I do, your Honor.  The defense would call

21  George Silva.

22          THE COURT:  Mr. Silva, if you will come forward, please?

23  And if you will stop there and please raise your right hand my

24  clerk will administer the oath to you.

25  Whereupon,

```
 1                              CERTIFICATE

 2

 3

 4

 5

 6

 7

 8

 9           I, Barry L. Fanning & Susan Zielie, Official Court
        Reporters, do hereby certify that the foregoing transcript is
10      true and correct.

11

12                              S/Barry L. Fanning

13                              _____
                                Barry L. Fanning
14

15                              S/Susan A. Zielie

16                              _____
                                Susan A. Zielie
17

18

19

20

21

22

23

24

25
```

# EXHIBIT G

Handwritten (left margin): 2444y FAX / 1433 229 41lc / LEGIT RIVET

**CAL EMBLEM**
3706 CADWALLADER AVENUE
SAN JOSE, CA 95121
(408) 274-8050 · 1-800-938-2536
FAX (408) 274-0104

**INVOICE**   23500

TO: HAYCD/JOHN FUKUSHIMA
15003 WINGATE STREET
SAN LEANDRO, CA 94579-

SALESPERSON:

SHIP TO:   6   DATE OF INVOICE: MARCH 06

| ACCOUNT NO. | DATE SHIP'D | SHIPPED VIA | C.O.D. | F.O.B. POINT | TERMS | YOUR ORDER NO. |
|---|---|---|---|---|---|---|
| 7136 | 03/06/96 | UPS GRND TRAC | | CAL EMBLEM | NET 10 DAYS | JOHN FUKUSHIMA |

| QUANTITY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|
| 500 | FE, 1 7/16 X 3 1/2 RECT, SQUARE CORNERS, RED/WHITE/RED, 500FA:REJ & WHITE//SUPERDRIER | 1.00 | 500.00 |
| 100 | FE, 1 X 3 1/2 RECT, SQUARE CORNERS, BLACK/WHITE /BLACK, 100FA:FILTHY FEU | 1.00 | 100.00 |
| | SUBTOTAL: | | 600.00 |
| | 8.25 % SALES TAX: | | 49.50 |
| | SUBTOTAL: | | 649.50 |
| | SHIPPING: | | 8.15 |

THANK YOU

MAR - 6 1996

| | TOTAL | 657.65 |

**CAL EMBLEM**
3706 CADWALLADER AVENUE
SAN JOSE, CA 85121
(408) 274-8050 · 1-800-938-2536
FAX# (408) 274-0104

# INVOICE 22634

**DATE OF INVOICE:** 18 AUGUST 95

TO/NAMECO
JOHN FUKUSHIMA
15003 WENGATE STREET
SAN LEANDRO, CA 94579-

SALESPERSON:
SHIP TO:

| ACCOUNT NO. | DATE ORDERED | SHIPPED VIA | B/O | J.O.B POUR | TERMS | YOUR ORDER NO. |
|---|---|---|---|---|---|---|
| 5725 | | UPS GROUND | | CAL EMBLEM | PRE-PAID | JOHN FUKUSHIMA |

| QUANTITY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|
| 100 | SPECIAL EMBLEM, 1 X 3.5 RECT, BLACK/WHITE/BLK, 1 DEAF/LAUNDRY FEW | 1.90 | 190.00 |
| *** | (No Sales Tax) - RESALE NO: *** | | |
| | SUBTOTAL: | | 190.00 |
| | LESS DEPOSIT: | | 190.00 |
| | SUBTOTAL: | | 0.00 |
| | SHIPPING/HANDLING: | | |
| | TOTAL | | -0- |

THANK YOU

AUG 1 6 1995

'96 08:20 LEWIS LEGAL SERVICE

FEB 2 8 1996

JOHN FUKUSHIMA-HAMCO
15003 WENGATE ST.
SAN LEANDRO, CA 94579

ATTENTION: JIM NOMURA

QUANTITY: 100
BLACK LETTERS AND BLACK BORDER ON WHITE TWILL

