ALAN P. CAPLAN
630 Carolina Street
San Francisco, CA 94107
(415) 826-2371
(415) 824-7148 (Fax)
MA Bar No: 072700
Email: apc716@pacbell.net

Attorney for Defendant
RUSSELL LYLES, JR.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>vs. )<br><br>RUSSEL LYLES, JR. )<br><br>Defendant. )<br>_____ ) | No: CR–08-00420-PJH-1<br>3-08-70351 MAG<br><br>**DEFENDANT LYLES MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS MOTION TO RECONSIDER DETENTION ORDER** |

## I.    INTRODUCTION AND STATEMENT OF FACTS.

On June 17, 2008, after a detention hearing, defendant Lyles was ordered by this Court to be detained pending trial of the above-numbered indictment.  A copy of the Court's detention order is attached hereto as "Exhibit A".

Mr. Lyles is charged with possession with intent to distribute more than 100 marijuana plants, possession of a firearm while being an unlawful user of a controlled substance, and possession of a firearm in furtherance of a drug trafficking offense.  The indictment does not mention the Hells Angels Motorcycle Club ("HAMC"), of which Mr. Lyles is admittedly a member, nor does it allege that Mr. Lyles conspired with anyone to commit the charged offenses.

1    Nevertheless, Paragraph 6 of the Detention order relies heavily upon representations

2  about made by a law enforcement agent to the Pretrial Services Officer in regard to defendant's

3  HAMC membership.  Defendant does not challenge the Court's right to consider his HAMC

4  membership in its release calculation; however the information that was provided to the Court

5  was inaccurate and incomplete.

6

7    Mr. Lyles was represented at the detention hearing by previous counsel, Anthony Brass.

8  Undersigned counsel did not file his appearance until July 16, 2008 at a status conference before

9  Magistrate Judge James, at which time the prosecution presented its initial discovery to

10  undersigned counsel.  It has produced considerably more information in the succeeding three

11  weeks that was not available to previous counsel for presentation to the Court including:

12
          • The search warrant application, affidavit and return of service, the contents of
13            which negatively impact prosecution claims as to the likelihood of Mr. Lyles
              being convicted.
14

15        • The recorded statements made by Mr. Lyles to law enforcement officers at the
            time of his arrest on June 12, 2008, which were described by the prosecution in its
16            cover letter to undersigned counsel as "post-arrest statements of the defendant",
            and referred to by the Court in its detention order, based upon government claims
17            at the detention hearing, as "the fact that he [Mr. Lyles] confessed to the charges".
            [Detention Order, ¶ 2, at P. 2].  The actual statements by Mr. Lyles greatly detract
18            from the government's claims as to the strength of its evidence.

19
          • Two CDs containing photographs and videos of the Lyles residence taken on June
20            12, 2008 at the time of the search.

21
          • Law enforcement reports in regard to Mr. Lyles arrest and the entry into and
22            search of his residence.

23        • A detailed criminal history for Mr. Lyles, and a full opportunity to discuss it with
            other counsel.
24

25        • Information pertaining to Mr. Lyles' personal finances and background.

26        • Significant information related to the HAMC and defendant's role as a member.

27

28

1    Undersigned counsel has filed a lengthy declaration in support of the instant motion

2  ("Caplan Declaration"), wherein he highlights relevant information gleaned from the discovery.

3  He also presents new and highly relevant information and evidence to the Court in regard to

4  defendant's participation and role in the HAMC as it impacts the issue of detention, based upon

5  knowledge from 35 years of experience in defending members of the HAMC in 12 federal and 9

6  state courts throughout the United States. [Caplan Declaration, ¶¶ 15-16]. Such new facts are

7  likely to greatly allay the concerns expressed by the Court in Paragraph 6 of its Detention Order.

8

9    Undersigned counsel has had the opportunity to carefully review and address the Court's

10  specific concerns about Mr. Lyles' release as expressed in its detention order. Defendant

11  respectfully asserts that many of the findings and conclusions in that order were based upon less

12  than complete and, at times, affirmatively inaccurate information from the prosecution, including

13  the following:

14

15    • That Mr. Lyles "has a strong incentive to flee", based upon a conclusion that
        Mr. Lyles "is likely to serve at least 10 years, which is buttressed by the strength
16       of the government's case and the fact that he confessed to the charges."
        [Detention Order, P.2, ¶ 2].

17

18    • That defendant "also has the ability to flee". [Detention Order, P. 2, ¶ 3].

19    • That he admitted he owned a large marijuana growing facility and downsized it.
        [Detention Order, P. 2, ¶ 3].

20

21    • His financial history discloses that "he is living beyond his means" and "may
        have access to concealed funds to finance flight". [Detention Order, P. 2, ¶ 3].

22

23    • "Defendant's affinity for guns and violence"; the 6 firearms found at his home;
        mace, saps and brass knuckles; 8 bulletproof vests; and the reasons for keeping
24       these weapons at his residence. [Detention Order, P.3, ¶ 5].

25    • That defendant's "five arrests, which resulted in 3 misdemeanor convictions, all
        involved weapons and assaultive behavior, including one conviction of
26       obstructing or resisting an officer". [Detention Order, P. 3, ¶ 5].

27

28

- Defendant's role at Sergeant at Arms in the HAMC, and his wearing of an HAMC "Filthy Few" patch on his vest is indicative of a propensity for violence. [Detention Order, P.3, ¶ 6].

**Mr. Lyles did not confess to the charges against him.**

In its detention order, the Court accepted the government's claim that Mr. Lyles had confessed to the instant charges at the time of his arrest on June 12, 2008. As a result, it concluded that he was likely to be incarcerated for at least 10 years because each of Counts One and Two carried statutory mandatory minimum sentences of 5 years, with the requirement that a sentence imposed on the 18 U.S.C. § 924(c) violation be served consecutively.

However neither defendant's previous counsel nor the Court had access to the actual recorded statements of Mr. Lyles at the time of the initial detention hearing. Undersigned counsel has listened to the recordings on several occasions, including once with Mr. Lyles, and has carefully memorialized the actual statements of Mr. Lyles and the interrogating agents. [Caplan Declaration, ¶ 5].

The "confession" was actually a 33 minutes series of questions and answers between defendant and the arresting agents, wherein Mr. Lyles did not confess to committing any crime whatsoever.[1] The officers began their interrogation by falsely stating that he was not yet under arrest, although when they made this statement they had previously located the marijuana "grow" and FBI agents had already placed him in handcuffs.

The officers then capitalized on Mr. Lyles' sincere belief that he was permitted to grow less than 100 marijuana plants under the medical marijuana laws of the State of California. They told him that if he were in fact in compliance with California law, they would bring this

---

[1] The details of this interrogation have been recounted at length in Paragraph 19 of the Caplan Declaration, and the recording will be available for the Court's consideration at any hearing on the instant motion.

1  "favorable information" to the attention of the "Febes" (FBI agents). [Recorded Conversation,

2  DS-400021, at 5:09 Minutes][2].

3      Mr. Lyles never stated that he had successfully grown more than 100 plants at a time.

4  Only 84 plants were found during the search.  Therefore, the statutory mandatory minimum 5

5
   year sentence under 21 U.S.C. § 841(a)(1) and (b)(1)(B), which requires seizure of more than
6
7  100 plants, is not likely to be applicable.

8      In response to agents' questions, he stated that his previous attempts to grow marijuana

9  had largely been unsuccessful.  The repetitiveness and confusion inherent in the agents'

10 questions and Mr. Lyle's responses left their applicability to any mandatory minimum sentence

11 highly problematical.  [Recorded Conversation, DS-400021, at 5:45, 12:00, 13:30, 1422, 20:02

12
   Minutes; [Recorded Conversation, DS-400024, at 1:27, 2:30, 4:19 Minutes].
13

14     Likewise, on three separate occasions the agents tried to get Mr. Lyles to agree that he

15 possessed the firearms at his residence for the purpose of "protecting the grow".  On each

16 occasion, Mr. Lyles emphatically denied that they were possessed for this purpose.

17     Mr. Lyles was first asked: "Do you got these [firearms] for club [HAMC] business or just

18 basically to watch your grow?"  Mr. Lyles responded spontaneously: "No, this has nothing to do

19
   with my grow.  This is my house man.  You know.  Everyone keeps a shotgun by the bed."
20
21 [Recorded Conversation, DS-400023, at 1:29 Minutes].

22     After Mr. Lyles further explained that he merely possessed the weapons for home

23 protection and as a collector, the agents sought to press the point: "Is it protection for the grow

24 *also*?"  Mr. Lyles again emphatically stated "No!".  The agents tried a third time, asking: "Got

25 any problems with the grow", and explaining that they just "were documenting how many people

26
   _____
   [2] All of the citations herein to specific times in the recordings are based upon undersigned counsel's statements in
27 Paragraph 19 of the Caplan Declaration.

28

1  get ripped-off?"  Again, Mr. Lyles replied "No".  Recorded Conversation, DS-400023, at 2:25

2  Minutes].

3      Therefore, Mr. Lyles certainly did not admit any facts to support a charge that he

4  possessed a firearm in furtherance of a drug trafficking crime, and certainly did not "confess" to

5  such a firearm offense.  It should be noted that Mr. Lyles was not under any firearms disability at

6
7  the time of the search, and all of the seized firearms were wholly "legal" for him to possess.

8  Several of them were located in a locked gun safe (for which Mr. Lyles voluntarily surrendered

9  the key), and the search warrant return, and law enforcement reports pertaining to the search

10  disclose that none of the firearms were found within or in the immediate vicinity of the grow

11  room.

12
13      **There is a substantial likelihood that motions to suppress evidence from the search
and to suppress Mr. Lyle's statements would be successful, thereby detracting from
the prosecution's claims about the strength of its case.**

14
15      Previous counsel did not have an opportunity to review the search warrant application,

16  affidavit, and return, which were first unsealed on July 24, 2008, almost six weeks after the

17  initial detention hearing herein.  [Caplan Declaration, ¶ 7].  Undersigned counsel was able to do

18  so, as well as to discuss these documents with Mr. Lyles.

19      It is the opinion of counsel that there are substantial grounds for suppression of all

20  evidence seized or obtained during the June 12, 2008 search, which would require dismissal of

21
22  the instant charges if successful.  [Caplan Declaration, ¶ 22].  Motions to suppress evidence will

23  be filed asserting that the search warrant affidavit is facially deficient; that it contains material

24  misstatements and omissions of facts essential to a finding of probable cause; that the search

25  warrant was overly broad; that the *29 member FBI Swat Team* violated the explicit no-knock

26  provision that this Court had inserted by hand into the search warrant by effecting their entry into

27
28

1   defendant's residence using "flash bangs" [flash grenades]; that numerous items of evidence

2   were seized without authorization in the search warrant; and that the "good faith" doctrine would

3   not apply to save this search, and that statements made by Mr. Lyles would likewise be excluded

4   as "fruits" of the unlawful search and seizures.

5

6   **Mr. Lyles was not living beyond his means, and had no funds with which to finance**
    **flight.**

7

8       In its detention order, the Court found that Mr. Lyles "has the ability to flee . . . [having]

9   traveled extensively throughout the United States and internationally." It also asserted that Mr.

10  Lyles financial history disclosed that he was "living beyond his means", and therefore might

11  have "access to concealed funds with which to finance his flight." [Detention order, P. 2, ¶ 3].

12  This conclusion was explicitly based in part upon inaccurate and incomplete information from

13  the government that defendant had "confessed" to having operated a large marijuana growing

14
    facility that had since been downsized.
15

16      In fact, almost all of Mr. Lyles' domestic travel, and all of his international travel, was

17  paid for by the HAMC, on behalf of which he undertook these trips. The HAMC either

18  reimbursed him for his travel expenses, or paid for them directly in the first instance. [Caplan

19
    Declaration, ¶ 24, P. 8]. I have attached hereto as "Exhibit X", with bank account numbers
20
    redacted, receipts for Mr. Lyles' South Africa trip showing such third party payment. Therefore
21
    such travel did not indicate that he was living beyond his means.
22

23      The Court's concern that Mr. Lyles might have hidden funds from his previous operation

24  of a "large marijuana growing facility" was based upon the prosecution's claim that Mr. Lyles

25  had confessed to previous large marijuana harvests. In fact, Mr. Lyles told the agents: "I didn't

26  get shit out of fucking 2-3 harvests". [Recorded Conversation, DS-400021, at 5:55 Minutes]. "I

27

28

1  haven't had a good harvest in so long. Most I've ever gotten out of here is 5-6 pounds."

2  [Recorded Conversation, DS-400021, at 12:00 Minutes]. [Caplan Declaration, ¶ 24].

3      Conjecture that Mr. Lyles may have concealed funds with which to flee is further belied

4  by a colloquy with the agents in response to their question about the location of his motorcycle.

5
   He told them that it was stored at a friend's house because his driver's license had been
6
   suspended for non-payment of fines. [Recorded Conversation, DS-400021, at 17:08 Minutes].
7

8      In response to the agents' inquiry about why he didn't just pay them, Mr. Lyles explained

9  that he owed Mendocino County "a couple of grand" and "several hundred to Sonoma County",

10  and that he was overdrawn on his bank account. He also told them that he operated a silkscreen

11
   T-shirt business and was trying to get a tanning salon going. [Recorded Conversation, DS-
12
   400021, at 17:25 Minutes].
13

14      **All firearms seized from Mr. Lyles' home on June 12, 2008, were lawful for him to**
15      **possess, and he maintained and stored them safely. Likewise, none of the charges**
        **that defendant had engaged in "assaultive behavior" involved allegations that a**
16      **dangerous weapon of any kind had been used, displayed or brandished.**

17      In its detention order, the Court stated that all of the weapons, including the firearms that

18  were seized at Mr. Lyles' home during the search, and the facts that defendant's previous arrests

19
   had "all involved weapons or assaultive behavior" were a source of concern, in that it suggested
20
   that defendant had an "affinity for guns and violence". The following information may
21
   ameliorate the Court's uneasiness. [Caplan Declaration, ¶ 27].
22

23      Mr. Lyles is not a felon, and was under no federal or state firearms disability at the time

24  of the search and seizure. All of the firearms seized during the search were "legal" in that none

25  had improperly modified or altered, or was inherently unlawful to be possessed by him (e.g. fully

26  automatic).

27

28

1  Mr. Lyles had been instructed on the safe use and storage of firearms from the time he

2  was a young boy.  For example, a number of the firearms seized at his home were kept in a

3  locked gun safe, and Mr. Lyles voluntarily surrendered the key to that safe to law enforcement

4  agents during the search.  [Recorded Conversation, DS-400021, at 7:29 Minutes].

5
6  In the same vein, Mr. Lyles' misdemeanor arrest on October 31, 2007 for CCW in a

7  vehicle was dismissed because the weapon was an *unloaded pistol*, registered to Mr. Lyles,

8  which had been placed inside of a *locked gun bag*, which in turn had been *placed in the trunk of*

9  *the vehicle* that Mr. Lyles was driving.  Thus Mr. Lyles committed no firearm violation on that

10  occasion, but instead had fully complied with proper gun handling procedures.

11  Similarly, defendant's first arrest in San Jose in 2003 for carrying a concealed firearm in

12  a vehicle and in a public place was completely dismissed.  There was no allegation in that case

13  that the firearm in question was in any way altered, stolen, or otherwise per se unlawful for him

14  to possess.

15
16  His Placerville arrest on July 3, 2003 for obstructing and impeding a police officer

17  contained no allegation that he actually struck the officer or in any way employed or threatened

18  him with a weapon.  The incident occurred at closing time at a bar, and Mr. Lyles, then age 23,

19  was admittedly drunk and acted inappropriately.  He accepted responsibility for his actions by

20  pleading guilty, and receiving a 10 day jail sentence and 24 months probation.  He was not

21  charged with any violation of that probation.

22
23  Likewise, the case in which Mr. Lyles pled guilty to challenge to fight in a public place in

24  Willets on September 1, 2005, did not involve any allegation that weapons were possessed, used

25  or displayed.  It is also important to note that the three charges against Mr. Lyles for assaultive

26  behavior all involved excessive use of alcohol, and the most recent of them occurred 3 years ago,

27
28

1    when he was under the age of 25. He is now almost 28, and has clearly learned to act more

2    responsibly in public.

3        It should also be noted that the law enforcement officers were willing to remove the

4    handcuffs from Mr. Lyles while they conducted their interrogation and search on June 12, 2008,

5    after accepting Mr. Lyles' promise that he would not create any problems if they did so.

6    Mr. Lyles was unrestrained for the remainder of the recorded conversation. [Recorded

7    Conversation, DS-400021, at 1:31 – 2:30 Minutes]. [Caplan Declaration, ¶ 28].

8

9        **Other non-firearm weapons seized at defendant's home were openly displayed on the fireplace mantle as a part of weapons collection, and there was no evidence that any of them had ever been actively used by Mr. Lyles.**

10

11        The Court also noted the non-firearms weapons seized during the search of defendant's

12    residence, specifically a mace, saps and brass knuckles. Mr. Lyles was brought by the agents,

13    uncuffed, into the direct proximity of these weapons, *all of which were found openly displayed*

14    *on the fireplace mantle*.

15

16        In response to questions from the interrogating agents, Mr. Lyles explained that he had

17    collected weapons for an arms' display he was creating, and elicited no negative response from

18    the agents. Mr. Lyles was told to "Step by the fireplace. There's brass knuckles, a leather sapper

19    and a club with nails." Mr. Lyles responded that he "collected all that stuff for years."

20

21        He was then asked if there were any more weapons like that at the house, and Mr. Lyles

22    truthfully replied: "No." [Recorded Conversation, DS-400022, at 0:15 Minutes]. Defendant

23    explained that he "just picked all this stuff up – trying to get a little display going on."

24    [Recorded Conversation, DS-400023, at 1:02 Minutes].

25        One of the agents, apparently understanding this purpose, responded in a teasing manner:

26    "Troy's mantle is a little nicer than yours." Mr. Lyles replied: "Is it?" The officer then rejoined:

27

28

1   "He's got a whole room." The officer was referring to the weapons display of another member

2   of Mr. Lyles' HAMC Chapter he had viewed during another search. [Caplan Declaration, ¶ 29].

3   **The bulletproof vests seized from defendant's residence were purchased from army**
    **surplus 5 years previously, had never been used and were too small to be used by**
4   **Mr. Lyles or by others in his HAMC charter.**

5       The Court also found "most troubling, [that] 8 bulletproof vests were found" during the
6
    search of defendant's home.    [Detention order, P.3, ¶ 5].    In fact, these vests were size
7
8   "medium", too small to be worn by Mr. Lyles, or anyone else his size or larger. This would

9   include most of his friends, including fellow members of his HAMC chapter. They certainly

10  were not unlawful for him to possess at the time of their seizure, nor was there any evidence that

11  they had ever been or even could be worn or utilized by Mr. Lyles or anyone else.

12      The agent asked Mr. Lyles: "What's up with the vests?"    Mr. Lyles responded: I
13
    stumbled across those. I've been lugging them around since I had my [motorcycle] shop – 5
14
15  years – 4-5 years. They're all mediums. I came across those in [unintelligible] Solano."

16      The agent then asked defendant: "What for?" Mr. Lyles replied: "For whatever. It's not

17  illegal. You can't do anything with them. I don't even fit into one of them, so I just stuck them

18  down here in the garage. I collect shit like that – army surplus."    [Recorded Conversation,
19
    DS-400024, at 3:31 Minutes]. [Caplan Declaration, ¶ 34].
20
        **Mr. Lyles service as a Sergeant at Arms in his HAMC chapter, and his wearing of**
21      **an HAMC "Filthy Few" patch, is not indicative of a propensity for violence.**

22      The final area of concern expressed by the Court in its detention order related to
23
    Mr. Lyles membership in the HAMC. It gave credence to unsupported hearsay statements from
24
25  "an FBI Special Agent" to the Pretrial Services Officer that defendant is "believed to be a

26  Sargeant (sic) at arms within the Hell's (sic) Angels Club, responsible for enforcing its orders

27

28

1    and rules", and is also "believed to be a member of the 'filthy few' which, it is alleged, indicates

2    that he is prepared to commit murder on behalf of the club." [Detention Order, P. 3, ¶ 6].

3        Again it is emphasized that Mr. Lyles is not charged with any offense involving the

4    HAMC. He is not alleged to have conspired with anyone in or outside the HAMC in committing

5    the crimes alleged herein. Nevertheless, defendant understands that under the Bail Reform Act,

6    the Court may consider any evidence it deems relevant to the release decision.

7

8        Although there is no evidence that Mr. Lyles was the Sergeant at Arms of the Sonoma

9    HAMC chapter at the time of his arrest, he has admittedly fulfilled that function at various times

10   during the course of his membership. The Sergeant at Arms in an HAMC chapter is indeed

11   responsible for maintaining order at meetings and ensuring, on a day-to-day basis that the

12   members comply with chapter and HAMC rules, including serving as "road captain" to maintain

13   safety during runs. However this is not a post that is given as a matter of course to the strongest

14   or "toughest" member of the group. [Caplan Declaration, ¶¶ 14-16, and 36].

15

16       Mr. Lyles is smaller in stature than many of the other Sonoma HAMC members, some of

17   whom are also accomplished in martial arts. The role of the Sergeant at Arms is to utilize

18   negotiation and diplomacy for the very purpose of avoiding internal conflict between members.

19   There is nothing about that function that should cause the Court concern if Mr. Lyles were to be

20   released on conditions.

21

22       Undersigned counsel has also heard the false allegation about the "Filthy Few" being

23   murderers for more than 30 years. In 1979 deceased Oakland HAMC member Albert Perryman

24   (a former client) explained to undersigned counsel the group began in the late 1960s when the

25   Northern California HAMC members went on an annual Summer "run" to Bass Lake.

26   Mr. Perryman claimed to be a "charter member" of the "Filthy Few", who received that

27

28

1   appellation because they were the first to arrive, the last to depart, and were acknowledged to be

2   the "heaviest partyers". [Caplan Declaration, ¶ 36, P. 15].

3       At some point in time, the story about the Filthy Few being "murderers" for the HAMC

4   began to circulate among law-enforcement agencies. However former HAMC members who

5

6   have become *cooperating prosecution witnesses* have no motivation to testify falsely on the

7   subject because of their grants of extensive immunity, have wholly discredited this theory.

8       In the Caplan Declaration, Paragraphs 36-39 at pages 15-18, there are detailed transcript

9   references to statements and testimony that support defendant's assertions that follow herein.

10  Patrick Matter, a 25 year HAMC member and former president of the Minnesota Chapter of the

11  Hells Angels began cooperating with the government in 2004. Mr. Matter was a *prosecution*

12  witness in two federal criminal cases in the District of Minnesota, wherein he testified under oath

13  about the "filthy few".

14

15      In the trial of *United States v. Jacobsen and Seydel*, CMr. Matter admitted on

16  cross-examination that he had "obtained a badge called the Filthy Few". Matter was then asked

17  "Isn't it true that the badge Filthy Few before '95 was a badge you earned by killing somebody?"

18  Mr. Matter answered: "No, it's not true." Matter was then asked: "Was the badge given to

19  members who killed people?" Mr. Matter responded: "I don't know that for a fact", but admitted

20  he had heard "rumors" to that effect.

21

22      Matter further testified that he and defendant Seydel, an active HAMC member, "decided

23  that we should have a Filthy few patch and sent in for them." Counsel asked: "You just put one

24  on? And Mr. Matter replied: "Yes, we did."

25      After the first trial against Jacobsen and Seydel ended with a deadlocked jury, Mr. Matter

26  testified again for the prosecution on January 27, 2005. When asked: "Tell the jury what a Filthy

27

28

1   Few patch is?" Matter replied: "It could mean anything. It could mean you rode to Sturgis for

2   the club [HAMC]. It could mean anything." Matter further testified that he wore a Filthy Few

3   patch for one year in 1994 for "Prestige or to look good in the club."

4       When challenged: "Isn't it true that you represented to the club that you murdered

5   somebody to get that Filthy Few patch? He again responded: "No, that's not true". He was then

6

7   Asked: "Isn't it true in the early 90s and late 80s, when somebody wore a filthy few patch it

8   meant they had committed a murder?" Matter replied: "That's what people would say at times,

9   but it is not true".

10      Matter was also queried: "Isn't that what the Hells Angels represented to the public?

11  That if somebody walked around with a Filthy Few patch they had murdered somebody?" He

12

13  responded "Not to my knowledge." [Caplan Declaration, ¶ 36, P. 15-16].

14      Paragraph 36 of the Caplan Declaration also provides details of information about the

15  "Filthy few" from another prosecution cooperating witness. Michael Kramer, a former HAMC

16  member and club officer from Arizona and Illinois, cooperated closely with the ATF and DEA in

17  investigations of criminal conduct within the Arizona HAMC and with respect to events in

18  California, Nevada and Illinois. He was made available to Police Officers from the Netherlands

19  as a credible witness with truthful information about the HAMC, and in 2004 was interviewed by

20

21  Dutch police in the company of ATF Agents.

22      Kramer was asked during a transcribed interview with an ATF agent and Dutch police

23  officers: "What kind of a meaning does the Filthy Few patch have?"  Kramer replied: "The

24  original meaning was that the Filthy Few were the ones that stayed at parties longer than anyone

25  else."  It should be emphasized Kramer, with whom undersigned counsel had never met or

26

27

28

1  spoken, echoed exactly the information that his client Albert "Big Albert" Perryman had
2  conveyed to him 25 years previously.

3      Kramer further explained that it was "more a thing to frighten guys like you, police
4  officers, etc. It doesn't mean you have killed someone for the club." He explained that "If you
5  knew how many Filthy Few patches there are, there would be far more unsolved murders. . . .
6
7  Filthy few is just a joke and a myth. It's just that 'Joe Public' would fear the Hells Angel
8  member wearing a Filthy Few patch."

9      Kramer also mentioned that "At the West Coast [meetings] Fooky from the Oakland
10 charter is the one who makes the patches and hands them out to his friends. I don't think there's
11 a difference between the meaning of Filthy few in Europe and the U.S. As far as I know the
12
   Filthy Few patches come from Oakland. Fooky is the only one who who makes them over here
13
14 and gives them out. He is an old member (20-30 years). Fooky could have given me 10 of them
15 and I could have distributed them." [Caplan Declaration, ¶ 36, P. 16].

16     As noted in the Caplan Declaration, ¶¶ 37-38, the person referred to as "Fooky", is an
17 HAMC member from Oakland named John Fukushima, who to the personal knowledge of
18 undersigned counsel is often referred to by the nickname "Fuki".

19     In May 2007, Mr. Fukushima testified as a defense witness at trial in *United States v.*
20
   *Fabel, et al.*, in the Western District of Washington, wherein he provided details of making and
21
22 delivering various HAMC insignia, including "Filthy Few" patches. A copy of the transcript of
23 his testimony is attached as Exhibit F to the Caplan Declaration.

24     Mr. Fukushima explained that he was 54 years old, had worked as an automotive
25 technician for 36 years, and had been an HAMC member for 30 years. [RT, P. 7051].

26
27
28

1    Fukushima testified that had been involved in the creation and sale of HAMC patches for

2   about 28 years, in a voluntary, not for profit endeavor. He would receive requests for various

3   types of HAMC patches, and after determining the type, color, size and numbers, he would

4   submit an order to one of several embroiderers who would fabricate them. Included in this

5   category were the "death-head" insignia and "rockers" for the back of HAMC vests, "city tags"

6   for the front, and what he termed "shock value tags". [RT, P. 7052-7053].

7

8    Mr. Fukushima explained that "shock value" tags had different sayings on them such as

9   "Dirty 30", Terror Team", "Hell on Wheels", "Wrecking Crew", "Bastard Brigade", "Frozen

10  Few" and "Filthy Few". He said he had made thousands of them over the years, sometimes 25 to

11  100 in a single order. He also identified a copy of receipts for an order of 100 "Filthy Few" Tags

12  and 500 "Red and White" [HAMC colors] supporter tags. A copy of these receipts was attached

13  to the Caplan Declaration as "Exhibit G". [RT, P. 7054-7055].[3]

14

15   Mr. Fukushima also testified that he is no longer the only person who makes these tags

16  for the HAMC, and that any HAMC member who called him and asked, would be sent the

17  requested tag, including the one bearing the legend "Filthy Few". [RT, P. 7060-7061].

18  Therefore, based upon the foregoing information and evidence, the Court may safely conclude

19  that Mr. Lyle's wearing of a "Filthy Few" patch on his vest is not a statement or boast about

20  murder, contrary to law enforcement misinformation on the issue.

21  //

22  //

23  //

24  //

25

26  [3] Undersigned counsel also recounted his awareness that, consistent with the reality that the Filthy Few were the "heaviest partyers", that "Frozen Few" patches are often worn by HAMC members who have attended an annual

27  motorcycle run and party in Alaska. [Caplan Declaration, ¶ 38, P. 18.]

28

**Additional information about HAMC members' compliance with conditions when granted pretrial release in federal prosecutions.**

Undersigned counsel has had extensive personal experience and knowledge with respect to the pretrial release of HAMC members in federal court over the past 35 years. Although clearly not conclusive, it may be considered by the Court in its release determination.

In his declaration, undersigned counsel detailed his experience in *United States v. Acosta, et. al.*, Case No; 03-542, before the Honorable James Mahan in the United States District Court for the district of Nevada. [Caplan Declaration, ¶¶ 40-45, P. 18-20]. His client was one of 42 defendants charged with Conspiracy, Violence in Aid of Racketeering (including an allegation that they did so to maintain or enhance their standing in the HAMC), and related firearm charges.

The case arose from a shootout on the floor of Harrah's Casino in Laughlin, Nevada on April 27, 2002, in which 3 people were killed and others were wounded. All 42 defendants were HAMC members, or closely affiliated with HAMC members, and 40 resided outside of Las Vegas, Reno, Seattle, Washington, Alaska, and various California cities ranging from Sonoma (in the north) to San Diego (south).

Notwithstanding the charges of Violent Crimes in aid of Racketeering (in which the HAMC was the alleged "enterprise"), and the prosecution's initial requests that they be detained, Judge Mahan ordered the release of *all but one of the defendants on signature bonds*, with travel limited only to the entirety of their respective states of residence, but permitting travel to Nevada as well. Judge Mahan also refused the government's request that they be prohibited from associating with co-defendants and with other HAMC members.

The first 12 of the 42 defendants began September 2006, and after approximately 2 weeks of jury trial, the case ended with 6 defendants pleading guilty to an "enterprise

1  conspiracy" *not* the HAMC.  Sentences for the five of six ranged from 1-3 years, one was

2  sentenced to 5 years, concurrent with a previously imposed sentence.  The cases against the

3  remaining 36 defendants were all ***dismissed with prejudice***."

4      Of note is the fact that during the almost 3 years that the case was pending, not one of the

5
   defendants, all of whom were affiliated in some way with the HAMC, had his pretrial release
6
7  revoked due to any act of violence.  Likewise, after 35 years of experience in handling

8  HAMC-related cases, not one of undersigned counsel's clients who had been granted pretrial in

9  state or federal court had his bond revoked for any reason whatsoever.

10

11 II.    **LAW AND ARGUMENT**

12      A.    **Pertinent Law on Pretrial Release.**

13     The leading case in this Circuit construing the Bail Reform Act of 1984 is ***United States v.***

14 ***Motamedi***, 767 F.2d 1403 (9th Cir. 1985).    Every principle regarding pretrial release

15
   jurisprudence that was established in that case by Judge (as he then was) Kennedy's opinion has
16
17 been unvaryingly followed to the present time.

18     The district court had ordered Motamedi, a citizen of Iran with an American "green card"

19 to be detained as a flight risk.  Initially released upon conditions, he was detained as a flight risk

20 after voluntarily appearing for arraignment on a 15 count superseding indictment charging him

21 with a "§371 conspiracy" and 14 substantive counts for unlicensed exportation or weapons,

22 subjecting him to a term of imprisonment of up to 33 years.[4]

23     The district court upheld the magistrate's ruling that Motamedi posed a serious risk of

24
   flight because: he was acting as a *de facto* arms purchasing agent for the Iranian government; he
25
26 had maintained large foreign bank accounts; and he had persisted in his export activities,

27 [4] Motamedi's charges antedated the Sentencing Reform Act, and he was therefore facing an "Old Law" sentence.

28

notwithstanding warnings from the U.S. Customs Service and FBI that it was illegal to export the items at issue. *Id.* at 1404-1405. The Court noted that there were certain "traditional" principles that must be followed in all cases that implemented the Bail Reform Act of 1984, (18 U.S.C. § 3141, et. seq.).[5] Among these were:

- **Release is the norm in non-capital cases.**

    A person arrested for a non-capital offense shall ordinarily be admitted to bail, and only in rare circumstances should release be denied. *Id.* at 1405; *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).

    Defendant Lyles respectfully submits that this prosecution is not such a "rare" case. It does not involve a conspiracy; it does not involve violence; it does not involve a protracted period of criminality; it does not involve large quantities of "hard" drugs; it does not involve interstate or international activities; it does not involve large quantities of money or other property. In the realm of federal criminal cases, it is about as "ordinary" as is possible: possession of less than 10 kilograms of marijuana, with allegations that defendant merely possessed (but did not brandish or fire) firearms in connection therewith.

- **Doubts should be resolved in favor of defendant's release.**

    "Doubts regarding the propriety of release should be resolved in favor of the defendant." *United States v. Motamedi*, 767 F.2d at 1404-1405; *United States v. Townsend*, 897 F.2d at 884; *Gebro*, 948 F.2d at 1121; *United States v. Chen*, 820 F. Supp. 1205, 1209 (N.D. Cal. 1992); *United States v. Ward*, 63 F. Supp.2d 1203, 1210 (C.D. Cal. 1999).

    It is believed that the Court was seriously considering release at the initial detention hearing. Defendant has now provided the Court with considerable additional information

---

[5] These principles have invariably been followed by decisions in this Circuit up to the present time.

1  pertaining to release that directly address concerns expressed in its detention order.  He

2  respectfully suggests that these additional, favorable facts and interpretations should cause any

3  lingering doubts to be resolved in favor of his release on conditions pending trial.

- **Weight of the evidence is the *least* important of the release factors.**

The Court in ***Motamedi*** also emphasized that a well-established principle from previous bail jurisprudence, that the weight of the evidence is the least important factor in the release decision, also applied under the Bail Reform Act.  ***Motamedi***, 767 F.2d at 1408.  The Court emphasized: "Although the statute permits the Court to consider the nature of the offense and the weight of the evidence [18 U.S.C. §§ 3142(g)(1) and (2)], the statute neither requires nor permits a pretrial determination that the person is guilty."  *Id.*  Accord, ***United States v. Gebro***, 948 F.2d 1118, 1121 (9th Cir. 1991); ***United States v. Winsor***, 785 F.2d 755, 757 (9th Cir. 1986); ***United States v. Cardenas***, 784 F.2d 937, 939 (9th Cir. 1986); ***United States v. Chen***, *supra*, 820 F. Supp. at 1207.

As Judge Walker noted in ***Chen***: the weight of the evidence is the ***least*** important factor only if, as in Mr. Lyle's situation, "the weight of the evidence is used to buttress a decision to detain the defendant.  If the evidence against a defendant is weak, that becomes an important factor favoring release."  *Id.*

Therefore, based upon information from the new discovery (especially the exact words spoken by Mr. Lyles during his interrogation by law enforcement), and the content of the search documents provided to defendant *after* the initial detention hearing on June 17, 2008, the likelihood of his conviction is considerably less than claimed by the prosecution.  Thus the prosecution's weakened case should affirmatively support pretrial release on conditions.

- **"Reasonably assure" does not require a guarantee or total certainty.**

The standard "reasonably assure" the defendant's appearance and the safety of any other person and the community, as used in the Bail Reform Act, does not require a "guarantee" or total certainty. *United States v. Orta*, 760 F.2d 887, 891-892 (8th Cir. 1985); *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985). Judge Walker also addressed this matter in *Chen*, *supra*, 820 F. Supp. 1205, 1208, noting that "Section 3142 does not seek ironclad guarantees".

In the case at bar, although Mr. Lyles is subject to the rebuttable presumptions of flight and dangerousness of 18 U.S.C. § 3142(e) and §3142(f)(1)(c), he has proffered substantial evidence to rebut that presumption. Therefore, the prosecution now bears the evidentiary of demonstrating, by clear and convincing evidence, that detention is required.

Admittedly, that presumption has not disappeared. However it remains merely one of the factors against release to be weighed along with other evidence relevant to the factors set forth in § 3142(g). *United States v. Hir*, 517 F.3d 1081 (9th Cir. 2008); *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986).

Therefore, at this juncture, the Court should reconsider the statutory factors set forth in §3142(g) in the context of all of the evidence on the issue of detention. Included in this calculation must be the substantial new matters raised in the instant Motion to Reconsider the Detention Order, the accompanying exhibits and declarations, as well as such additional evidence and argument as this Court shall receive at any hearing on the instant motion.

## II.    CONCLUSION.

Defendant believes that he has given the Court ample reasons to reconsider and revoke the present detention order. He asserts that the rare imposition of pretrial detention cannot be justified under the circumstances of this prosecution, and Mr. Lyles' personal background.

1    While the Court may legitimately consider all evidence relevant to the release decision,

2 he respectfully suggests that in its detention order the Court placed too much weight on firearms

3 and other weapons at Mr. Lyle's home.  The constitutional right to possess wholly legal firearms

4 for persons who, like Mr. Lyles, were not under any statutory disability, was recently reaffirmed

5 by the United States Supreme Court in *District of Columbia v. Heller*, 128 S. Ct. 2783; 171 L.

6
Ed. 2d 637 (2008).  While many Americans choose not do so, either on personal principle or for
7
8 safety concerns, a contrary choice is neither unlawful nor immoral in a legal context.

9    Likewise, although collecting and displaying weapons may not be everyone's choice of

10 hobby, it is respectfully suggested that it was neither illegal, abnormal, nor morally wrong for

11 Mr. Lyles to choose to do so.  Equally important is that the Court's concern in regard to
12
defendant's possession of these weapons can easily be addressed by the standard condition of
13
release that prohibits possession of firearms and other dangerous weapons.[6]
14

15    In conclusion, defendant asks that after a hearing, and based upon all of the evidence and

16 applicable legal principles, he should be granted pretrial release on conditions.

17
Dated:  August 16, 2008.
18

19
20                              Respectfully submitted:

21                              /s/Alan P. Caplan_____
                                630 Carolina Street
22                              San Francisco, CA 94107
                                Phone: 826-2371
23                              Fax: 824-7148
                                E-Mail: apc716@pacbell.net
24

25

26

27 _____
[6] Again it is noted that Mr. Lyles has never been accused of assaulting anyone with a firearm or any other weapon.
28

1

## **CERTIFICATE OF SERVICE**

2

3        I hereby certify that on August 16, 2008, I caused to be electronically filed under seal my

4
General Appearance as Counsel for Defendant Russell Lyles, Jr. with the Clerk of this Court

5
using the CM/ECF system which will send notification of such filing to AUSA Wai Shun Wilson

6
Leung.

7

8        Dated: August 16, 2008.

9

10                                        s/ Alan P. Caplan
                                          Alan P. Caplan
11                                        630 Carolina Street
                                          San Francisco, CA 94107
12                                        Phone: 826-2371
                                          Fax: 824-7148
13                                        E-Mail: apc716@pacbell.net

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1

2

3

4

5

6

7

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,    )
                                  )
12          Plaintiff(s),         )    No. 3-08-70351 MAG
                                  )
13     v.                         )
                                  )    **DETENTION ORDER**
14   RUSSELL A. LYLES JR.,        )
                                  )
15          Defendant(s).         )
                                  )
16

17       On June 17, 2008 I heard the government's motion to

18   detain Mr. Lyles.  Assistant United States Attorney Wilson

19   Leung appeared for the government.  The defendant was present

20   with his counsel, Tony Brass.

21       Having considered the parties' proffers, and the pretrial

22   services report which recommended detention, I find that the

23   government has met its burden of showing by a preponderance of

24   the evidence that the defendant presents a risk of flight and

25   by clear and convincing evidence that the defendant presents a

26   danger to the community.  I also find that defendant has

27   proposed conditions of release which would reasonably assure

28   that he would make his appearances but there are not

                            1

1  conditions of release that would reasonably assure the safety
2  of the community.  Some of the factors which I considered in
3  reaching this decision follow:

4      1.  Defendant faces a maximum of life imprisonment and
5  two consecutive mandatory minimum 5 year terms of
6  imprisonment, given the seriousness of the charges.  This
7  creates a rebuttable presumption that "no condition or
8  combination of conditions will reasonably assure appearance of
9  the person and safety of the community."  18 U.S.C. § 3142(e).

10     2.  He is likely to serve at least 10 years, which is
11 buttressed by the strength of the government's case and the
12 fact that he confessed to the charges.  Defendant did not
13 dispute the government's proffer that he is not eligible for a
14 safety valve because of his criminal history and the weapons
15 charges.  He therefore has a strong incentive to flee.

16     3.  Defendant also has the ability to flee.  He has
17 traveled extensively throughout the United States and
18 internationally.  In his confession, he admitted that he owned
19 the large marijuana growing facility found at his residence
20 and that he had downsized it.  That, coupled with the fact
21 that his financial history discloses that he is living beyond
22 his means, suggests that he may have access to concealed funds
23 with which to finance flight.

24     4.  At the same time, he does have substantial ties to
25 the community.  His parents were present in court to support
26 him, as were a number of friends.  He has a fairly stable
27 residential and employment history, though it is not clear how
28 successful his clothing store is.  Defendant proffered that a

2

1    friend, Stephen Wilson, would be willing to post his home in
2    Redwood Valley as security for a bond.  Mr. Wilson was
3    present, confirmed this proffer and estimated his equity at
4    $450,000.  Defendant also proffered that his parents would co-
5    sign the bond.  I am satisfied that a half million dollar bond
6    secured by the signatures of his parents and Mr. Wilson's
7    property, together with other appropriate conditions which
8    would include electronic monitoring, would adequately assure
9    that the defendant made his appearances.

10        5.  Of greater concern is the defendant's affinity for
11   guns and violence.  His five arrests, which resulted in 3
12   misdemeanor convictions, all involved weapons and assaultive
13   behavior, including one conviction of obstructing or resisting
14   an officer.  The search accompanying the arrest found 6
15   firearms at his house, 3 shotguns, 2 rifles and a pistol, some
16   of which were loaded, substantial quantities of ammunition,
17   including a magazine for an AR15 rifle (but no rifle), a mace,
18   saps and brass knuckles.  Most troubling, 8 bulletproof vests
19   were found.  I do not accept defendant's rejoinder that he
20   needs all of these weapons because there are bears in Willets
21   or because he lives in a rural environment.

22        6.  In addition, the pretrial services report contains
23   information from an FBI Special Agent that defendant is
24   believed to be a Sargeant at Arms within the Hell's Angels
25   Club, responsible for enforcing its orders and rules, and that
26   he is believed to be a member of the "filthy few" which, it is
27   alleged, indicates that he is prepared to commit murder on
28   behalf of the club.

7.  Finally, I can think of no conditions of release that would reasonably assure the safety of the community, given defendant's affinity for violence and weapons.  I am troubled by the fact that he has committed several offenses while on probation for prior offenses, which suggests that he is unlikely to abide by any conditions of release that I would impose to help assure the safety of the community.

Based on the foregoing, the government's motion to detain is **GRANTED.  IT IS HEREBY ORDERED** that:

(1) The defendant be, and hereby is, committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

(2) The defendant be afforded reasonable opportunity for private consultation with his counsel; and

(3) On order of a court of the United States or on request of an attorney for the government, the person in charge of the corrections facility in which the defendant is confined shall deliver the defendant to an authorized Deputy United States Marshal for the purpose of any appearance in connection with a court proceeding.

Dated: June 17, 2008

Bernard Zimmerman
United States Magistrate Judge

G:\BZALL\CRIMINAL\ORDERS\DETENTIO\2008\LYLES DETENTION ORDER.wpd

4

# EXHIBIT B

### your trip reservation

**Booking reservation number:** YCP394

• We recommend you make a note of the booking reservation number or print this page.

#### traveller information

**Russel Lyles**

**Steven Wilson**

#### Contact information

Home phone:     SFO7075264556
Business phone:  *****PLEASE CHARGE (3375.04) AMOUNT TO THE CREDIT

#### e-ticket numbers

Only e-ticket numbers are displayed when they are issued. Paper ticket numbers are not included in the display.

**Document 016-7224286888:  San Francisco - San Francisco**  Russel Lyles
**Document 016-7224286889:  San Francisco - San Francisco**  Steven Wilson
**Document 016-2173739782:  San Francisco - Cape Town**  Russel Lyles
**Document 016-2173739783:  San Francisco - Cape Town**  Steven Wilson

#### your flight selection

**Airline confirmation number(s):** United Airlines QLW9P2 South African Airways YCP394

#### San Francisco to Frankfurt

| **Flight 1** | **Tuesday, April 01, 2008** | |
|---|---|---|
| confirmed | **Departure:** 18:56 | San Francisco, USA - San Francisco International , terminal I |
| | **Arrival:** 15:00 +1 day(s) | Frankfurt, Germany - Frankfurt International , terminal 1 |

| Airline: | United Airlines UA926 | Duration: | 11:04 |
|---|---|---|---|
| Fare type: | Economy Restricted | Aircraft: | Boeing 777-200/300 |
| Baggage: | information not available | Last check in: | information not available |

DINNER, BREAKFAST

#### San Francisco to London

| **Flight 1** | **Wednesday, April 02, 2008** | |
|---|---|---|
| confirmed | **Departure:** 16:50 | San Francisco, USA - San Francisco International , terminal I |
| | **Arrival:** 11:00 +1 day(s) | London, United Kingdom - Heathrow , terminal 5 |

| Airline: | British Airways BA284 | Duration: | 10:10 |
| Fare type: | Business | Aircraft: | Boeing 747-400 |
| | | Last check in: | information not available |

MEAL (NON SPECIFIC)

## London to Cape Town

**Flight 1**  
confirmed

| **Departure:** | 19:20 | London, United Kingdom - | Heathrow , terminal 5 |
| **Arrival:** | 07:50 +1 day(s) | Cape Town, South Africa - International | Cape Town |

**Thursday, April 03, 2008**

| Airline: | British Airways BA059 | Duration: | 11:30 |
| Fare type: | Business | Aircraft: | Boeing 747-400 |
| | | Last check in: | information not available |

MEAL (NON SPECIFIC)

## Cape Town to San Francisco

**Flight 1**  
confirmed

**Tuesday, April 15, 2008**

| **Departure:** | 19:00 | Cape Town, South Africa - International | Cape Town |
| **Arrival:** | 06:20 +1 day(s) | London, United Kingdom - 1 | Heathrow , terminal |

| Airline: | South African Airways SA220 | Duration: | 12:20 |
| Fare type: | Economy | Aircraft: | Airbus Industrie A340-600 |
| Baggage: | 20 kilogram(s) per traveller | Last check in: | information not available |

DINNER, BREAKFAST

Change of plane required. Time between flights = 3:45

**Flight 2**  
confirmed

**Wednesday, April 16, 2008**

| **Departure:** | 10:05 | London, United Kingdom - | Heathrow , terminal 1 |
| **Arrival:** | 13:09 | San Francisco, USA - | San Francisco International , terminal I |

| Airline: | United Airlines UA955 | Duration: | 11:04 |
| Fare type: | Economy Restricted | Aircraft: | Boeing 747-400 |
| Baggage: | information not available | Last check in: | information not available |

LUNCH, SNACK OR BRUNCH

## Flight payment
Air Fare not Available

## Flight Notes
• Not all seat and meal options are offered on all flights.

• Specific rules and restrictions may apply to this fare.
• Taxes are included except where local airport taxes are collected at check-in time.

## Flight special requests

| | Traveller | Seat number | Seat location | Meal preference |
|---|---|---|---|---|
| Meal and seat request: | | | | |
| **San Francisco - Frankfurt** | | | | |
| Flight 1: San Francisco - Frankfurt | Russel Lyles | 42F | None specified | No special meal |
| | Steven Wilson | 42G | None specified | No special meal |

**San Francisco - London**

| Flight 1: San Francisco - London | Russel Lyles | None specified | None specified | No special meal |
|---|---|---|---|---|
| | Steven Wilson | None specified | None specified | No special meal |

**London - Cape Town**

| Flight 1: London - Cape Town | Russel Lyles | None specified | None specified | No special meal |
|---|---|---|---|---|
| | Steven Wilson | None specified | None specified | No special meal |

**Cape Town - San Francisco**

| Flight 1: Cape Town - London | Russel Lyles | None specified | None specified | No special meal |
|---|---|---|---|---|
| | Steven Wilson | None specified | None specified | No special meal |
| Flight 2: London - San Francisco | Russel Lyles | None specified | None specified | No special meal |
| | Steven Wilson | None specified | None specified | No special meal |

| Meet and assist travellers with special needs: | None specified |
|---|---|
| Wheelchairs needed: | 0 |

Indicates airline has confirmed your seat or meal requests. If it has not been confirmed within 24 hours, you may want to contact the airline directly.

## miscellaneous

**WAS (Washington, District of Columbia, USA)**
Tuesday, October 21, 2008

## destination information

**Frankfurt, Germany**

**Current weather**
Partly Cloudy
High: 22 ºC
Low: 18 ºC
5-day forecast

**London, United Kingdom**

**Current weather**
Partly Cloudy
High: 16 ºC
Low: 15 ºC
5-day forecast

**Cape Town, South Africa**

**Current weather**
Sunny
High: 20 ºC
Low: 8 ºC
5-day forecast

**San Francisco, USA**

**Current weather**
Partly Cloudy
High: 19 ºC
Low: 12 ºC
5-day forecast

## general remarks

*** YOUR CREDIT CARD MAY SHOW ONE OR MORE CHARGES
*** WITH A TOTAL PRICE OF $3375.04 ***
CALL AIRLINE 72HRS PRIOR DEPARTURE TO RECONFIRM SC
******* NO SHOW NO MONEY ******

*TOTAL AMOUNT CHARGED FOR ALL TICKETS IS $3375.04
ST THIS IS ELECTRONIC TICKET

reservation office

WTC
5815 SEMINARY RD
FALLS CHURCH VA 22041
US
Tel:703 379 1777
Fax:703 379 6983
E-mail:CS@AIRFARE.COM

© 2008 Amadeus IT Group SA. All Rights Reserved